LUMMUS COMPANY, Defendant, Appellant,

v.

COMMONWEALTH OIL REFINING COMPANY, Inc., Plaintiff, Appellee (three cases).

Nos. 5552–5554.

United States Court of Appeals First Circuit.

June 16, 1960.

Rehearing Denied Aug. 10, 1960.

See, also, 273 F.2d 613.

John T. Cahill, New York City, with whom Lawrence J. McKay, New York City, Raymond L. Falls, Jr., Youngstown, Ohio, Herbert S. McConnell, San Juan, P. R., Putnam, Bell, Santry & Ray, Boston, Mass., Cahill, Gordon, Reindell & Ohl, New York City, and McConnell, Valdes & Kelley, San Juan, P. R., were on brief, for appellant.

John F. Dooling, Jr., New York City, with whom Richard deY. Manning, Milton Pollack, Hamilton F. Potter, Jr., Jeffrey A. Fillman, New York City, Ruben Rodriguez-Antongiorgi, San Juan, P. R., Sullivan & Cromwell, New York City, and Fiddler, Gonzalez, Guillemard & Rodriguez, San Juan, P. R., were on brief for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is an appeal under 28 U.S.C. § 1292(a) (1) from an interlocutory order, dated July 20, 1959, of the United States District Court for the District of Puerto Rico entering a preliminary stay of arbitration and granting a preliminary injunction enjoining defendant-appellant from taking any further action in a case pending in the United States District Court for the Southern District of New York, or any other steps in furtherance of the arbitration. Defendant-appellant, The Lummus Company, a Delaware corporation with its principal office in New York, N. Y., is engaged, *inter alia,* in designing and constructing oil refineries. Plaintiff-appellee, Commonwealth Oil Refining Co., Inc., is a Puerto Rican corporation, which describes itself as the owner of an oil refinery in Puerto Rico built for it by the defendant. The controversy between the parties arises out of two contracts entered into in New York in July 1954, and March 1956, under which

Lummus undertook to design, build, initially supervise, and guarantee the performance of, first, the original refinery, and then later its expansion facilities, for a guaranteed maximum cost of some $35,000,000. Both contracts contain the following clause:

"Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration * * *. The arbitration shall be held in New York, U.S.A." [1]

The refinery has been built, and Lummus has received some $32,500,000 therefor. The original plant commenced operation on December 31, 1955, and the expansion facilities on September 30, 1957. Operation, however, has been at a marked loss, rather than at the substantial profit anticipated. Since at least 1957 Commonwealth has expressed dissatisfaction with Lummus' performance, and Lummus, *inter alia*, with Commonwealth's refusal to pay sums claimed to be due for work and materials.

On April 29, 1959, Lummus mailed, and on April 30 Commonwealth received, a demand for arbitration of its claim to recover some $4,700,000 from Commonwealth, and of "any set-offs or counterclaims * * * which Commonwealth may assert." On May 4, Commonwealth instituted an action in the District of Puerto Rico, in which it alleged, in substance, that Lummus had prepared "oil refinery economic and capability studies and earnings projections based thereon (herein called, collectively, 'studies and

projections')" relating to the refinery; that the " 'studies and projections' were false and misleading," and that Lummus either knew this to be so or made the representations "with reckless indifference as to the truth or falsity thereof"; that Commonwealth relied on the "studies and projections" and was induced by the representations contained therein to execute the two contracts, "which plaintiff would not have executed but for such false and misleading 'studies and projections' * * * "; and that, "by reason of the facts set forth in this complaint, plaintiff has suffered financial losses and damages in an amount exceeding $60,-000,000 * * *." As relief, the complaint sought:

"(a) judgment * * * in the sum of $60,000,000, plus other sums as yet undetermined * * *; and

"(b) such rescission under the laws of the State of New York of the two contracts * * * as may be just and equitable * * * or a declaration as to their inexistence under the laws of the Commonwealth of Puerto Rico * * *." [2]
At the same time Commonwealth served a motion in the district court, "pursuant to 32 L.P.R.A. § 3204(4) (a)," [3] to stay the New York arbitration on the ground that the arbitration clauses were invalid by reason of fraudulent inducement of the contracts. On May 20 Lummus served a motion in the New York County Supreme Court to compel arbitration. On May 25 Commonwealth filed a petition to remove that proceeding to the United

---

1. The entire clause reads:
"25.1 Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration in accordance with the rules, then obtaining, of the American Arbitration Association. This Agreement shall be enforceable and judgment upon any award rendered by all or a majority of the arbitrators may be entered in any court having jurisdiction. The arbitration shall be held in New York, U.S.A. It is agreed, however, that this Agreement shall not apply to claims or damages for which either party has contracts of insurance protecting their respective interests."

No issue has been raised wtih respect to the last sentence and we assume it has no applicability to the claims here involved.

2. We will analyze this complaint in more detail later. There is a further claim not material to the present proceedings, as no preliminary relief is requested thereunder, which will be disregarded.

3. Chapter 259, §§ 3201–29, Title 32 L.P.R.A., constitutes the Puerto Rico Arbitration Act. Its provisions are typical of modern arbitration statutes. The provisions relevant here are discussed further, infra.

States District Court for the Southern District of New York, hereinafter called the Southern District. On May 29 Lummus obtained from that court an order for Commonwealth to show cause, returnable June 2, why the present proceedings should not be enjoined. No further steps were taken in the Southern District because on the same day Commonwealth obtained from the court below, *ex parte*, a temporary order restraining further proceedings in the Southern District. On June 1, Commonwealth moved for a preliminary injunction restraining Lummus from taking any further action in the Southern District or elsewhere in furtherance of arbitration until final determination of the motion of May 4 for a stay of arbitration. Decision was reserved on this motion, but the temporary restraining order was continued in force to June 18. On that date, Judge Ruiz-Nazario being out of the district, a hearing was held before Senior Judge Magruder, sitting in the district court by special assignment, on the matter of continuing the temporary restraining order pending determination by Judge Ruiz-Nazario of the original motion to stay arbitration, and of the motion for a preliminary injunction. On June 19 Judge Magruder entered a preliminary injunction, to expire July 20, stating that he was doing so in order to give Judge Ruiz-Nazario opportunity to make the final decision on the questions before him. See 174 F.Supp. 485. On July 6 Lummus moved for a modification of Judge Magruder's order to permit it to move in the Southern District to remand that action to the state court. This motion was denied on July 17. See 175 F.Supp. 873.[4] On July 20 Judge Ruiz-Nazario entered an order preliminarily staying the arbitration "until this Court enters its order finally determining whether there are valid and existing arbitration agreements * * *," and granted the preliminary injunction enjoining Lummus from taking any steps in furtherance of the arbitration, in the Southern District or otherwise.

Admittedly Lummus' appeal from the decree of July 20 presents all pertinent matters. It raises a substantial number of difficult questions. They can be divided into three major groupings. First, Lummus contends that the district court, as a matter of equitable jurisdiction, should not have enjoined the New York proceedings, but should rather have stayed its own. It bases this contention, first, on the priority of the New York proceedings, arguing that they commenced with the service of the arbitration demand, and second, on the contention that New York is a more proper forum because New York law is controlling, because New York is more convenient for the parties and witnesses, and because jurisdiction over Lummus in Puerto Rico is doubtful.[5] We do not stop to consider these contentions at any length. What we presently have here is simply a question of two pending actions, i. e., the motion to stay arbitration and the action to compel arbitration, in two federal courts of concurrent jurisdiction, each of which is being asked to consider what is basically a different side of the same coin. There is no reason why both suits should continue at the same time. This would be detrimental to both the parties and the federal judicial system. Although priority of suit is often taken as a basic factor in determining which should give way, see Martin v. Graybar Elec. Co., 7 Cir., 1959, 266 F.2d 202, "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation, does not counsel rigid mechanical solution of such problems." Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 1952, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200. We are disposed to believe

4. Appeals from these orders of June 19 and July 17 are also before us. They will be separately considered.

5. This last matter was argued to some extent below and the court preliminarily found that jurisdiction over the person of Lummus had been obtained. We concur in this preliminary finding, but the issue is not really before us on this appeal except in this tangential fashion.

that the District Court in Puerto Rico was in fact the first *court* to take hold of this matter. Cf. Marchant v. Mead-Morrison Mfg. Co., 2 Cir., 1928, 29 F.2d 40, 42–43, certiorari denied, 1929, 278 U.S. 655, 49 S.Ct. 179, 73 L.Ed. 565; American Houses, Inc. v. Schneider, 3 Cir., 1954, 211 F.2d 881, 885, 44 A.L.R. 2d 1352; Minkoff v. Scranton Frocks, Inc., D.C.S.D.N.Y., 1959, 172 F.Supp. 870, 876–877. We also believe that there were sufficient reasons which would have justified that court, as a matter of discretion, in staying its own proceedings in favor of those in New York. But as it has not done so, we are not prepared to hold that there was an abuse of discretion.

The second grouping of issues concerns the power of the district court. Lummus contends that a federal court sitting in Puerto Rico is unable to stay an arbitration which the parties have specified is to take place in New York. In the view we take of this case, this issue becomes moot. It also contends that the New York proceedings were improperly removed from the state court, and that had they remained there, 28 U.S.C. § 2283 admittedly would have prevented the court below from enjoining the proceedings in the state court. It assigns three reasons why the removal was improper. First, a motion to compel arbitration under a state statute involves a remedy which a federal court cannot grant; second, the removal was not timely because not made within twenty days after the service of the demand for arbitration; and third, the Southern District, as an Article III court, is without diversity jurisdiction because Commonwealth is a citizen of Puerto Rico, which is not a State within the meaning of Article III of the Constitution. Should we answer the first two contentions in favor of Commonwealth, we would be faced with the third, which raises constitutional issues. Under familiar principles, these should not be decided unless necessary. We accordingly pass to the third grouping, which we find dispositive. This is that Commonwealth's allegations of fraudulent inducement present no sub-

stantial issue as to the voidability of the arbitration contracts which would warrant a plenary hearing.

All facts were established by affidavits and exhibits. Commonwealth was incorporated in May 1953. Since October 1951, however, Lummus had been working with those persons who were promoting and organizing the refinery. The organizers were engaged in securing contracts for the purchase of crude oil, commitments for the sale of refined products, financial backing, and, of course, designs and a contract for construction. Lummus assisted the organizers, and then the corporation itself, in their negotiations for purchase and sale contracts. It also supplied the corporation with economic and profitability estimates for many hypothetical refineries. Upon being told what type of crude oil would be used and what type of refined products were desired, Lummus would estimate the type of refinery needed, the capital outlay for such a refinery, and the expected profit. These estimates went through a number of revisions as different types of crudes or refined products were hypothesized. Essentially the same type of estimates were also made for the expansion facilities. Some of the figures concerning product yields supplied by Lummus were also used by the underwriters in charge of the financing in the preparation of profitability forecasts which were included in two volumes, known as the Green and White Books, used to interest prospective investors. The construction contracts with Lummus were negotiated over a long period of time, and each had an effective date at least six months prior to the date of execution. The contracts guaranteed the maximum construction costs, and guaranteed product yields, both as to quantity and quality, but neither contained the type of profitability forecasts which Lummus had earlier furnished. Both contracts contained provisions for performance tests designed to establish whether or not the refineries met the contractual guarantees. For various reasons, including the fact that Commonwealth has not been processing

the crude oils upon which the guaranteed yields were based, Lummus' demands for tests have not been met. This has been a major area of contention.

In May 1956, two months after making the contract for the expansion facilities, Commonwealth ceased making payments due to Lummus under the original contract, claiming setoffs. In October 1956, it informed Lummus that, "Recent reports appear to confirm our fears concerning possible basic inadequacies in design or construction." Commonwealth's Annual Report for 1956, dated January 31, 1957, indicates a number of the difficulties encountered in operations which resulted in a substantial loss instead of a contemplated profit. It stated that "our greatest difficulties have been with the vacuum tower, the catalytic cracker and the utilities, namely, power, steam and cooling water." It appears from the record that the irregular electric power supply was the fault of the Puerto Rico Water Resources Authority, but that the irregularities had caused considerable loss of operating time because of the use of highly sensitive control mechanisms which needed a more stable power source. In February 1957, there were extensive changes in top management, and the executive offices were moved from New York to Puerto Rico. In May 1957, the M. W. Kellogg Co. was hired by the underwriters to make an independent evaluation of the refinery. The report, dated November 25, 1957, as of October 23, 1957, pinpointed four major factors accounting for an "uneconomic operating history." These were: 1. unrealiable electric power; 2. electronic instrumentation incompatible with the power supply; 3. circulation difficulties in the catalytic cracking unit; and 4. "an overly integrated heat exchange system. * * *." (This latter had also been pointed out to Commonwealth by another independent study submitted in January 1956.) The report indicated that steps had already been taken to correct some of these deficiencies and that

upon completion of other planned capital expenditures, the refinery "is, in general, mechanically sound and capable of operation on a normal basis." The report also stated that, "The present top management is now thoroughly competent and deserving of every reasonable confidence." The Kellogg report also estimated a yearly return for the refinery after certain basic improvements had been made, and stated: "This figure is [approximately one half that] * * * depicted in the so-called 'White Book—Case C'. The 'White Book' figures are grossly optimistic with respect to yields of the high quality (high price) products and operating costs." The report then recommended substantial additional capital expenditures which would, in its opinion, achieve returns comparable to those which had been originally predicted.

It appears from the record that Commonwealth and Lummus continued working together to adjust their differences until shortly before this suit was brought.[6] Lummus apparently had men working at the refinery under the contracts until at least February 1959. Meetings were held between officials of both companies and the underwriters during 1958 and 1959, the last having been held on March 24, 1959. Another was scheduled for April 24, but postponed to May 4, before which date Lummus demanded arbitration. The record also contains the affidavit of Commonwealth's president (who took office in February 1957 upon the change of management). He calls attention to the Kellogg report and seeks to establish that the figures described as "grossly optimistic" therein were based on product yields supplied by Lummus. He also seeks to rebut any inference which might be drawn from the fact that in 1958 Commonwealth also contracted with Lummus to build an additional unit costing almost $3,000,000, which unit was completed and accepted in March 1959, pointing out that at the same time Commonwealth indicated its continuing dissatisfaction

6. These differences, as will be developed infra, did not include any charges of

fraud, the basis of the present proceedings.

with the refinery, but felt compelled to use Lummus in order to speed completion of the new unit. Finally, after first establishing his qualifications as a chemical engineer who has spent his "entire time working in or closely associated with petroleum refining, research, operation, design construction and administration," affiant states:

"I believe that the anticipated product yields and resulting earning projections set forth in the Green and White Books were not based on sound technical estimates prepared in accordance with the standards of professional refinery engineering. I believe they were based on estimates which Lummus personnel, from the very nature of the engineering and economic analysis they were making, must have known were false or misleading or which they should have known were false or misleading or, else that they were prepared without any belief or any sound engineering foundation for a belief, on the part of Lummus that refinery equipment capable of attaining such yields and projected earnings could be constructed at the price it guaranteed."

There are many "or"s in this statement, but we will assume for present purposes that it asserts legal fraud.

The district court believed that Commonwealth's right to stay arbitration was governed by the Puerto Rico arbitration statute, particularly by §§ 3201 and 3204, Title 32 L.P.R.A. These sections are essentially similar to related sections of both the New York and federal arbitra-

tion acts, and we need not decide which is ultimately the governing statute.[7] Under the New York act, persons "may contract to settle by arbitration a controversy thereafter arising between them and such * * * contract shall be valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." If arbitration is demanded and the "opposing party * * * sets forth evidentiary facts raising a substantial issue as to the making of the contract * * *, an immediate trial of the same shall be had." N.Y.Civil Practice Act, §§ 1448, 1458, subd. 2. See also id., §§ 1450, 1451. The Puerto Rican statute provides that agreements to arbitrate "shall be valid, requirable and irrevocable except for the grounds prescribed by law for the reversal of an agreement." "If the court finds that a substantial dispute has arisen as regards the validity or existence of the arbitration agreement, * * * the court shall proceed immediately to hear such dispute." "In order to give rise to [such] a dispute * * *, the party concerned shall state the proved facts on which said dispute is founded * * *." 32 L.P.R.A. §§ 3201, 3204(2), (4). The federal statute follows the earlier New York form and omits the word "substantial," but is otherwise not significantly different. See 9 U.S.C. §§ 2, 4.

The court granted the stay upon finding that "Commonwealth can probably prove that [Lummus'] * * * representations have in fact been proved to be false"; that "Commonwealth can introduce evidence that it relied upon these representations * * *," and "that it would not have entered into the given

7. Questions as to the governing law of this case in a number of different contexts have been much mooted before us, but neither party has been entirely consistent in using the law it suggests as controlling. Commonwealth tells us we must look to the law of Puerto Rico but presents us with none (other than the arbitration statute). Lummus contends that New York law applies, but then, in its reply brief, on the basis of the decision in Robert Lawrence Co. v. Devonshire Fabrics, Inc., 2 Cir., 1959, 271 F.

2d 402, certiorari granted, 1960, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, tells us that the U. S. Arbitration Act governs. If this latter be so, then of course some of its objections to the power and jurisdiction of both the Puerto Rican and New York district courts collapse. We give our reasons below for applying New York law to the question of construction of the arbitration contracts, but beyond this we do not find it necessary to go.

contracts or perhaps any contracts with Lummus but for these representations"; and that "Commonwealth can introduce evidence tending to prove that these representations * * * were fraudulent." It then concluded: "A substantial dispute has arisen and a substantial issue exists * * * as to whether there was fraud in the inducement of the contracts * * *." These findings are the essential foundation for Commonwealth's case. Lummus contends that they were unwarranted. Although arguments have been presented on the issues of falsity and reliance, we believe that a substantial issue has been made out. The real difficulty lies in the question of fraudulent (or reckless) intent. We think that Commonwealth has assumed a difficult task to establish that a concern of defendant's admitted reputation and consequence not merely undertook to build a $35,000,000 refinery, but agreed to guarantee the maximum price and the performance, with reckless indifference, let alone intentional misrepresentations, as to whether that performance could be achieved. The evidence before us from which such intent or conduct could be inferred is merely the reference in the Kellogg report to the "grossly optimistic" figures of the White Book, and the conclusory allegations of Commonwealth's president. But having in mind the intangible nature of fraud, and the inherent difficulties of proof, we are short of willing to reverse the lower court's preliminary findings, and believe it preferable to look into other issues.

In his opinion supporting his order of June 19, Judge Magruder stated: "If the District Court finds the fraud to be [in the inducement] * * *, and that such fraud vitiates the whole contract, the issue of fraud obviously cannot be submitted to arbitration. The Court is thus obliged to decide preliminarily whether the contract and the arbitration clause within it are nullified by fraud. This is so under New York law as well as under Puerto Rican law. [Citation of New York cases omitted]." 174 F.Supp. 485, at page 488. Judge Ruiz-Nazario adopted the same approach when he ruled that, "The fraud alleged * * * would, if it is so proved, vitiate the whole of the contracts; the issue of such fraud in the inducement is not arbitrable and cannot be submitted to arbitration." We think that this ruling, and Judge Magruder's corresponding remark that "the issue of fraud obviously cannot be submitted to arbitration," require further consideration. First, must the fraud which may have induced [8] the agreements whereby Lummus undertook to design, build, and guarantee the refineries (which contracts, minus the arbitration clauses, we shall call the principal agreements) be regarded as vitiating the undertakings to arbitrate? That is, may not the arbitration agreements be considered as separate and separable contracts even though they are physically embodied in the same instruments as the principal agreements? Secondly, if the arbitration clauses are not separable, are claims within the scope of the arbitration clause necessarily nonarbitrable, or do they merely become so by virtue of Commonwealth's election to avoid the principal agreements? And finally, if the avoidance of the principal agreements is requisite to the avoidance of the arbitration clauses, has Commonwealth properly sought to exercise that right?

Although we have assumed that Commonwealth has made a prima facie showing of voidability so far as the principal agreements are concerned, with respect to its agreement to arbitrate, considered of itself, there appear to have been no factual misrepresentations at all. If the agreement to build and the agreement to arbitrate are to be regarded as a single agreement, both promises were obtained by the one fraud, and the one must fall with the other. But if the agreement to arbitrate is regarded as a separate undertaking, and particularly if it is broad enough to encompass any issue of fraud in the inducement, such an under-

---

8. No question arises in this case, or in any of the cases cited in this opinion, as to fraud in the factum, a very different matter.

taking should not be voidable unless there was fraud directed specifically to it. Commonwealth says that this is illogical. We think not. We see no reason why parties should not agree, if they wish to, that if a question arises as to whether the principal agreement was obtained by fraud, that that question will be arbitrated. For a court then to hold that fraud which bore only upon the principal agreement automatically invalidated the arbitration contract would be to destroy precisely what the parties had sought to create. Moreover, any other approach sets the stage for delaying action, and invites the injured party to cast what is basically a claim for breach of warranty or failure to perform, which would be arbitrable, into an action based on fraudulent inducement. In some instances, it may prevent even the injured party who wishes to arbitrate from doing so. The very fraud for which he wishes to recover can be used by the defrauding party to take the plaintiff's claim from the arbitrator. Cf. Wrap-Vertiser Corp. v. Plotnick, 1957, 3 N.Y.2d 17, 163 N.Y.S. 2d 639, 143 N.E.2d 366, infra. For these and other reasons, including an analysis of the language of the arbitration statutes themselves, a strong case can be made for construing arbitration agreements as separable from the principal agreements, and as voidable only for fraud directly affecting their existence, as distinguished from representations relating to the content or making of the principal agreements. See generally, Robert Lawrence Co. v. Devonshire Fabrics, Inc., supra, note 7; Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 2 Cir., 1960, 274 F.2d 805, 808–809; Parsell, Arbitration of Fraud in the Inducement of a Contract, 12 Cornell L.Q. 351 (1927); Sturges, Fraudulent Inducement as a Defense to the Enforcement of Arbitration Contracts, 36 Yale L.J. 866 (1927); Nussbaum, The "Separability Doctrine" in American and Foreign Arbitration, 17 N.Y.U.L.Q.Rev. 609 (1940).

■■ This, however, is not a matter in which we feel free to follow our own views. See Bernhardt v. Polygraphic Co. of America, 1956, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199.[9] We think it clear that New York law must govern. Not only were the agreements made in New York, but the agreements to arbitrate were to be performed there. Other substantial contacts with New York include the negotiation of the agreements there, and the fact that at the time the contracts were made both parties maintained their principal executive offices there. Additionally, both contracts contained clauses stating that the contracts "shall be deemed to have been made, executed and delivered in New York, New York," a factor which indicates a choice of law by the parties themselves, as does provision for arbitration in New York.[10] Looking to that law, we believe that the New York courts would not approach this question as we would. Although the

9. In the Robert Lawrence case, the Second Circuit treated the separability issue as a matter of federal law under the U. S. Arbitration Act. We question whether separability is a matter of federal rather than state law in a diversity case, whether or not the federal arbitration act applies for other purposes. See 73 Harv.L.Rev. 1382 (1960); cf. American Airlines, Inc. v. Louisville & Jefferson County Air Bd., 6 Cir., 1959, 269 F. 2d 811; Ross v. Twentieth Century-Fox Film Corp., 9 Cir., 1956, 236 F.2d 632. But see Note, 69 Yale L.J. 847, 858–61 (1960).

10. Commonwealth contends that reference to such matters in the contracts is foreclosed by the claim of voidability. Our belief that it is not is presently supported by Restatement 2d, Conflict of Laws (Tentative Draft No. 6, April 22, 1960) §§ 332a, Comments d and e, 334b. Comment c. As far as significant contracts are concerned, it is true that actual construction took place in Puerto Rico. On the other hand, the designing of the refineries and the procuring of the equipment undoubtedly occurred in New York. See generally, id., §§ 332a, 332b, 334b, 334e, 354h. See also Cruz v. Dominguez, 1905, 8 P.R.R. 551; Colon v. Registrar of Aguadilla, 1915, 22 P.R.R. 344; Del Moral v. National City Bank, 1937, 52 P.R.R. 221.

Court of Appeals has never squarely considered the separability doctrine, it has made observations on the subject which would have to be specifically withdrawn before it could reach our suggested result. See Wrap-Vertiser Corp. v. Plotnick, supra [3 N.Y.2d 17, 163 N.Y.S.2d 641]. In that case, the parties had agreed to arbitrate any question "as to the validity, interpretation or performance of this agreement." Plotnick sought to arbitrate several matters, including one which the court held was a claim for damages for fraudulent inducement of the contract. The majority of the court held that this claim was not arbitrable because it did not fall within the terms of the particular arbitration clause. According to the court, the claim concerned neither "interpretation" nor "performance," and since Plotnick was affirming the contract by seeking damages rather than avoiding it by seeking rescission, the question of "validity" was not in issue. But the court went on to say that even if Plotnick had "asked for rescission, such an issue would have had to have been decided in court before it could be known that an agreement existed supplying a foundation for the jurisdiction of the arbitrators." 3 N.Y.2d at page 20, 163 N.Y.S.2d at page 641, 143 N.E.2d at page 367. While this was only dictum, it was directly expressed. It also finds support in other New York decisions.[11] It is true that since that case

the court has decided Danann Realty Corp. v. Harris, 1959, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597. There it was held that the plaintiff could not complain of fraud in the inducement of a contract to purchase a lease because of a provision in the agreement that the buyer was not relying upon any prior representations. The court said, 5 N.Y.2d at page 321, 184 N.Y.S.2d at page 602, 157 N.E. 2d at page 599, "It is not alleged that this provision was not understood, or that the provision itself was procured by fraud." The same observation could be made in the case at bar. If fraud can be said to relate only to the "principal agreement" so as not to affect a provision not to assert fraud, it is doubly difficult for us to see how fraud inducing the principal agreement renders inoperative a provision for arbitration. Possibly the court now, if squarely presented with this issue, will depart from its *obiter dictum* expressed in Wrap-Vertiser. But for the present we feel constrained to accept as an established doctrine of New York law that an arbitration clause cannot be treated as separable from the other parts of the contract.

Of course a contract which has been fraudulently induced is not void but merely voidable, and the injured party need not avoid the contract, but may elect to affirm and seek damages in deceit. This distinction was alluded to by the

11. It is clear that a claim of rescission based upon total breach or "fraud in the performance" does not put in issue the "making of the contract." (This phrase, as previously noted, occurs in a number of places in the New York act. The Puerto Rican act uses the more precise phrase, "validity or existence of the arbitration agreement," but it is clear that the two have been treated as equivalent.) See, e. g., Matter of Kahn's Application, 1940, 284 N.Y. 515, 32 N.E.2d 534; Lipman v. Haeuser Shellac Co., 1942, 289 N.Y. 76, 43 N.E.2d 817, 142 A.L.R. 1088; Charles S. Fields, Inc. v. American Hydrotherm Corp., 1958, 5 A.D.2d 647, 174 N.Y.S.2d 184. But it has been held that a claim of fraudulent inducement does place it in issue, and "if the contract was voided by fraud the arbitration provision therein falls."

Cheney Bros. v. Joroco Dresses, Inc., 1926, 218 App.Div. 652, 219 N.Y.S. 96. That case was reversed in the Court of Appeals on the ground that no fraud had been shown, but the court expressly did not pass on the separability question. 1927, 245 N.Y. 375, 157 N.E. 272. For other cases similar to Cheney Bros., see, e. g., Application of Gruen, 1940, 173 Misc. 765, 18 N.Y.S.2d 990, affirmed without opinion, 259 App.Div. 712, 18 N.Y.S.2d 1023; Horli Chemical Sales Corp. v. Oliphant, Sup.1945, 68 N.Y.S.2d 177; Application of Manufacturers Chemical Co., 1940, 259 App.Div. 321, 19 N.Y.S.2d 171, appeal dismissed, Manufacturers Chemical Co. v. Caswell Strauss & Co., 283 N.Y. 679, 28 N.E.2d 404. The Cheney Bros. case is criticized by Dean Sturges in the comment noted supra, 36 Yale L.J. 866 (1927).

Court of Appeals in Wrap-Vertiser. We think the inference is clear from that court's decision that a mere damage claim, even though based on fraudulent inducement, does not put in issue the "making of the contract" and may be arbitrated under a sufficiently broad arbitration clause. Both the actual holding of that case and its relevant dictum seem well stated in the following passage: "If he [Plotnick] were seeking rescission, none of the items in his arbitration demand could be arbitrated until the issue of rescission had been determined in the courts. *Even in view of his affirmance of the contract*, it is still for the courts to determine whether he has been damaged by fraud in being induced to enter into this agreement. Item 1 of Plotnick's arbitration demand does not spell out an arbitrable dispute *within the arbitration clause in this contract*." 3 N.Y.2d at page 19, 163 N.Y.S.2d at pages 640–641, 143 N.E.2d at page 367 (ital. suppl.).

■ Since Wrap-Vertiser, the distinction between damage and rescission claims has been applied in at least two other cases.[12] In Amerotron Corp. v. Maxwell Shapiro Woolen Co., 1957, 3 A.D.2d 899, 162 N.Y.S.2d 214, the court confirmed an *ex parte* arbitration award entered against Shapiro, who claimed that the contract had been induced by fraud, and who had originally brought a deceit action against Amerotron in Massachusetts. The court stated: "By all of its actions respecting its claim of fraud inducing the contract, including its complaint in the Massachusetts action, [Shapiro] failed to rescind the contract and elected to recognize the contract and claim damages for the fraud. Such a claim was arbitrable and should have been arbitrated under the contract." On appeal, Shapiro argued, *inter alia*, that

Wrap-Vertiser, decided two days after the Appellate Division's decision in Amerotron, had established that a claim of fraudulent inducement such as Shapiro's was not arbitrable. Brief for Respondent-Appellant Maxwell Shapiro Woolen Co. in the New York Court of Appeals, pp. 8–10. The Court of Appeals, however, affirmed, without opinion, the decision below. 1958, 4 N.Y.2d 722, 171 N.Y.S.2d 111, 148 N.E.2d 319.[13] In another recent case, the Appellate Division has again drawn a distinction between rescission and damage claims. M. W. Kellogg Co. v. Monsanto Chemical Co., 1959, 9 A.D.2d 744, 192 N.Y.S.2d 869, affirming the decision of the New York County Supreme Court, N.Y.L.J., April 1, 1959, p. 12, col. 4. Monsanto had sued Kellogg in Delaware, seeking damages for fraudulent inducement of a contract, negligence, and failure to perform. Monsanto also sought, in Delaware, to enjoin Kellogg from prosecuting any arbitration proceedings in New York. Kellogg countered with motions in the New York court to compel arbitration and for temporary injunctions enjoining Monsanto from further prosecuting its Delaware actions. The court granted this relief, holding that all of the claims were arbitrable under the broad arbitration clause. The Appellate Division affirmed on the basis of Amerotron, and distinguished Wrap-Vertiser because of the narrow arbitration clause there involved. The court pointed out that by seeking damages the contract had been "affirmed" by the injured parties in both cases. We believe it fair to say that on the basis of these cases there is a trend in the New York decisions, if not towards an acceptance of separability, at least in the direction of a more careful consideration of what is sought when the party op-

12. The distinction does not appear to have received explicit consideration in any earlier New York case. It is difficult to state the reason for this, because of the brevity of the opinions and their failure to set out the facts. It would appear, however, that in most of the cases the contracts were executory and the defrauded party was merely using the

fraud defensively. Commonwealth, of course, seeks much more than this.

13. A fuller statement of this case may be found in Maxwell Shapiro Woolen Co. v. Amerotron Corp., 1959 Mass.Adv.Sheets 851, 158 N.E.2d 875, a related case arising out of the original tort action.

posing arbitration cries fraud.[14] We hold that unless, by means of a proper claim for rescission, Commonwealth has put in issue the "making of the contract," it cannot, by merely asserting fraud, stay the arbitration proceedings.

The purpose of an action for rescission, as distinguished from one for damages, is to permit the defrauded party to obtain restitution of the benefits conferred by him.[15] The contract is not merely terminated (as with a "rescission" based on a total breach), but is abrogated and undone from the beginning. See Black, Rescission of Contracts and Cancellation of Written Instruments § 1 (2d ed. 1929); 2 Restatement, Contracts § 349, Comment *a* (1932). With this in mind, we must determine what kind of rescission it is that Commonwealth wants, and to what kind, if any, it is entitled. The principal thrust of the complaint, the pertinent parts of which were set forth above, appears to be a tort action for damages. To this claim is appended a demand for: " * * * and (b) such rescission * * * as may be just and equitable * * *." These plainly are not alternative claims, only one of which is intended to be carried through to judgment. Nor can they be claims for cumulative relief under which Commonwealth both affirms the contract and receives damages, and at the same

time rescinds the contract and gets restitution. Such double recovery is nowhere allowed. The claim, therefore, must be interpreted as either for damages for deceit based upon an affirmance of part of the contract, together with rescission of part of the contract; or it must be for an entire rescission, together with such special damages as are necessary to make Commonwealth whole. On the face of the complaint, the first construction seems the proper one. The initial prayer asks for money damages almost double in amount what Commonwealth paid to Lummus, "plus other sums as yet undetermined." In addition, Commonwealth indicates no intent to return any part of the refinery. Such claims suggest an affirmance of the contracts. We note that in both Judge Magruder's order of June 19, and Judge Ruiz-Nazario's order of July 20, Commonwealth's claim is termed as one for "damages," and its motion for a stay of arbitration as having been filed "in the present tort case." Commonwealth nowhere criticizes these characterizations as inaccurate. The prayer which follows, for "such rescission * * * as may be just and equitable," has the appearance of a mere claim for partial rescission appended upon the damage action. If partial rescission is what is sought, presumably it is of the provisions for arbitration. No other division is suggested. However, there cannot be a

14. See, e. g., Matter of General Fuse Co., 1956, 2 A.D.2d 695, 153 N.Y.S.2d 598, later opinion, 1957, 7 Misc.2d 997, 162 N.Y.S.2d 630, reversed, 1958, 5 A.D.2d 1013, 174 N.Y.S.2d 270; Reo Garment, Inc. v. Jason Corp., 1958, 9 Misc.2d 521, 170 N.Y.S.2d 412, modified, 6 A.D.2d 401, 178 N.Y.S.2d 368, affirmed without opinion, 6 N.Y.2d 725, 185 N.Y.S.2d 812, 158 N.E.2d 505; Bichler v. 100 Lexington Avenue Corp., 1957, 4 A.D.2d 949, 167 N.Y.S.2d 877; Lugay Frocks, Inc. v. Joint Board Dressmakers' Union, Sup. Ct.,N.Y.L.J., July 1, 1958, p. 3, col. 1, affirmed without opinion, 6 A.D.2d 1000, 177 N.Y.S.2d 1008; In re Pan American Trade Development Corp., Sup.Ct., N.Y.L.J., Aug. 21, 1957, p. 3, col. 1; East Meadow Sanitation Service, Inc. v. Adelstein, Sup., 202 N.Y.S.2d 735; Matter of Grossman, Sup., 203 N.Y.S.2d 393. See also 6 Corbin, Contracts §§ 1444, 1444A

(1951, and Supp.1959). We note that in Robert Lawrence, the Second Circuit examined the New York cases and found them expressive of a "restrictive * * policy." 271 F.2d at page 412. The court, however, considered neither the damages-rescission distinction, nor some of the more recent cases we have cited.

15. The recovery of special damages for the limited purpose of putting the defrauded party back in as good a position as he occupied before entering into the contract may be awarded in connection with, and in addition to, rescission and restitution. This type of recovery is permitted by statute in New York, N.Y. Civ.Prac.Act, § 112–e, and by the better practice in other states. See study contained in the 1941 Report of the Law Revision Commission, N.Y.Legis. Doc. (1941) No. 65(L), pp. 291–344.

partial rescission. It is fundamental that a single agreement cannot be rescinded in part and affirmed in part. 2 Restatement, Contracts § 487 (1932); 5 Williston, Contracts § 1525 at p. 4271 (Rev. ed. 1937); In re Meiselman, 2 Cir., 1939, 105 F.2d 995, 998; Merry Realty Co. v. Shamokin & Hollis Real Estate Co., 1921, 230 N.Y. 316, 323, 130 N.E. 306, 308. Commonwealth cannot first ask us to consider the contracts as entire and indivisible for the purpose of making the arbitration clauses voidable by virtue of fraud relating to the principal agreements, and then seek to treat the provisions as separable so as to affirm part and rescind the rest.

■ Our construction that no rescission of the entire contracts was intended is further supported by certain statements in Commonwealth's brief. A party who seeks restitution is, of course, normally required to make restoration of the benefits received, in specie, so that the other party, as well, can be restored to the status quo so far as possible.[16] This is the logical consequence of the action, which disaffirms the contract and returns to the defrauded party whatever he has parted with. But when faced with this prospect, Commonwealth states: "Lummus would now suggest that even if plaintiff was induced to place its economic future in Lummus' hands by fraud, Commonwealth is now bound to tender back substantially its entire business assets, its refineries, as a condition to rescinding the fraudulently induced contracts. In other words, in order to rescind Commonwealth must go out of business."[17] The implication of this is clear—Commonwealth has no wish to make restoration and go out of business. But if a party that has acquired a business wishes rescission, this is exactly what it must do.

Although the requirement of restoration in specie admits of a number of exceptions, most of these are of no conceivable relevancy here.[18] Certainly no exception is predicated on a choice by the defrauded party not to restore. If it does not care to restore, it should not elect to rescind. We recognize, of course, that restoration in money rather than in specie is permitted in certain instances where specific restoration is "impossible." It is to be noted that there is nothing in the record to indicate to what extent such restoration is in fact impossible. Passing this, and the important fact that Commonwealth appears not to wish to restore even that which it might be able to, we do not believe this to be a proper case for such substituted restoration. We will assume that "if specific restoration became impossible before the party seeking restitution knew the facts and had an opportunity to act thereon, restitution is granted upon the payment of value or the imposition of conditions *if justice cannot otherwise be done * * *.*" Restatement, Restitution § 66 (3).[19] This limited exception is not in-

16. For the sake of clarity, the term "restitution" is used to denote the relief sought by the defrauded party, and the term "restoration" used to denote the return by the defrauded party of what he has received.

17. We do not construe this protest as meaning that Commonwealth simply does not wish to make a tender, and go out of business now, as a condition precedent to litigating. Lummus made no such suggestion, nor does the law so require. See, e. g., N.Y.Civ.Prac.Act, § 112-g; 1946 Report of the Law Revision Commission, N.Y.Legis.Doc. (1946) No. 65 (B).

18. See Restatement, Restitution §§ 65-66 (1937); Patterson, Restoration of Benefits Received By One Entitled to Avoid a Transaction, 1946 Report of the Law Revision Commission, N.Y.Legis.Doc. (1946) No. 65 (B), pp. 71-77; 5 Williston, Contracts §§ 1529-30 (Rev. ed. 1937); 5 Corbin, Contracts § 1114 (1951); Note, 29 Colum.L.Rev. 791 (1929); 32 Mich.L.Rev. 550 (1934).

19. This rule is in fact given as an exception, to be applied in the case of things other than chattels, to the more general rule in the Restatement that with regard to non-fungible chattels rescission cannot be had if substantial restoration in specie is not possible. We believe this may be too stringent, and therefore assume the more flexible rule quoted. We refer to the Restatement be-

compatible with our view that for a party to retain a valuable res (other than money or fungible goods) and make some "compensatory" credit or adjustment, is contrary to the entire concept of rescission and restitution. It is significant that we have nowhere found a case where a party has succeeded in effecting rescission, and has at the same time retained *in its own possession* all of the very res which constituted the tendered performance of the other side. Even assuming that such a result might be allowed "if justice cannot otherwise be done," we do not believe that a desire to avoid arbitration constitutes such an imperative where nothing else in the case suggests that rescission and restitution are necessary to afford Commonwealth compensation for its injury. To allow Commonwealth to rescind and to keep the fruits of the contracts by permitting it to make substituted restoration would be just another way of allowing it to rescind merely the arbitration clauses, the very part as to which there was no fraud.

There is an additional reason why Commonwealth could not effect a rescission of the principal agreements. "An unreasonable delay in manifesting an avoidance of a transaction after the acquisition of knowledge of the facts terminates the power of rescission for fraud * * * if the interests of the transferee * * * are harmed or were likely to be harmed by such delay." Restatement, Restitution § 64. See also id. § 68; 2 Restatement, Contracts §§ 483–84. In January 1956, an independent consulting engineer employed by Commonwealth questioned a major design feature, and stated that one of Lummus' estimates was not realistic; in October 1956, Commonwealth informed Lummus of its fears as to "possible basic inadequacies in design or construction"; and by November 1957, or earlier, Commonwealth had received the Kellogg report, with its reference to "grossly optimistic" figures, and its detailed analysis of the refinery. The record is bare as to any subsequent occurrence which threw any new light on the situation. The parties met frequently to discuss their various claims and what should be done. Not, however, until after Lummus had demanded arbitration in April 1959, did Commonwealth say anything about rescinding any agreement, or make any mention of fraud. On the contrary, as late as January 1959, Commonwealth was expressly calling upon Lummus to meet its obligations under the contracts,[20] and at least implicitly maintained that position until the institution of this suit. Throughout this period Lummus spent, according to an affidavit, "huge amounts of money, effort and time," which it asserts it would not have spent had it understood there was to be a claim for rescission.

Although Commonwealth filed a number of affidavits on the present motions, some of them lengthy, it has not alleged, even in conclusory form, that it acquired any new knowledge later than in the fall of 1957 by means of which it "discovered" its right to rescind. In reply to Lummus' contention that it must be taken to have affirmed the contracts well before May 1959, Commonwealth states in its brief that throughout the summer and fall of 1958 the parties were discussing the performance tests called for by the contracts, and that "as late as January 13, 1959 Commonwealth was demanding

cause we have found no cases, either in New York or in any other jurisdiction, which we consider to be in point.

20. For example in a letter of January 15, 1959, Commonwealth's secretary and general counsel stated that although Commonwealth felt that the acceptance-test provisions of the contracts were no longer applicable, "We did not and do not mean that we think Lummus is released from any of its contractual liabili-

ties to this Company. * * * [Y]ou are not relieved of your obligations to perform the required services under the contract." Similarly, when Lummus informed Commonwealth in February 1959 that it was withdrawing four operators at the refinery, Commonwealth's president replied, "So far as we are concerned, these operators are at the refinery under the construction contracts, but, being your employees, are of course subject to your supervision and control."

action with respect to the replacement of pumps at the refinery * * *." These and other similar matters are described in its brief as *"significant facts indicating a recent date of discovery of the true nature of Lummus' contract * * *."* (Italics supplied.) What seems to us more significant is that there is nowhere any affirmation that the discovery was, in truth, recent. The facts alleged as "indicating" that it was, indicate no more than that Commonwealth did not choose to rescind, as distinguished from not knowing that it had a right to. The closest that Commonwealth comes is a statement that "the very magnitude and technical complexity of the refineries made complete comprehension of what had occurred belated and difficult." Even this, however, is in its brief, not in any affidavit. It then adds, "The necessarily brief time available to make the presentation to the Court below precluded, of course, the most exhaustive demonstration of Commonwealth's position." Having in mind that the record before us occupies 588 printed pages, and was evi-

dently even larger below, we can hardly take counsel's apology as a substitute for the total absence from the record of any factual, or even conclusory, allegations on this subject. The only thing that the record shows to be newly discovered is an antipathy to arbitration.

If Commonwealth were pursuing with vigor an evident attempt to rescind the principal agreements, and had presented some, even slightly plausible, excuse for not having made its claim sooner, we might be disposed to say that an issue of fact had been made out. Instead, however, after opportunity to make a full presentation, there appears a consistent pattern of an attempt to defeat arbitration by asserting fraud as to the principal agreements, and then seeking to rescind solely the agreements to arbitrate. Commonwealth cannot blow hot and cold in the same breath. If the agreements to arbitrate are separable from the principal agreements no ground has been shown for their avoidance. If they are not separable, we hold it has shown no basis for rescission at all.[21]

---

21. In its complaint, Commonwealth asked for either rescission of the contracts under New York law, or, alternatively, "a declaration as to their inexistence under the laws of the Commonwealth of Puerto Rico." Although Commonwealth has not briefed this latter, we have given it some attention. An action for a declaration of inexistence is the proper remedy where any or all of the three essential requisites for a contract, including consent, is wholly lacking, as in a simulated contract. See § 1213 of the Civil Code, 31 L.P.R.A. § 3391; Gonzalez v. Fumero, 1928, 38 P.R.R. 497; Logia Caballeros del Plata v. Garcia, 1944, 63 P.R.R. 279; Guzman v. Guzman, 1955, 78 P.R.R. 640. There is no period of prescription (statute of limitations) for such an action. Guzman v. Guzman, supra, at 649. However, if a contract contains the necessary effectuating requisites, "although tainted with defect or vice," there is nonetheless a contract "because there is the possibility of confirming the same and this cures the defect." Gonzalez v. Fumero, supra, at 507. In other words, the contract exists but is voidable. One form of defect in the consent may be that it was obtained by deceit, Civil Code, § 1217,

31 L.P.R.A. § 3404, which includes what we have referred to as fraud in the inducement. Civil Code, § 1221, 31 L.P.R.A. § 3408; Rivera v. Heirs of Diaz, 1949, 70 P.R.R. 168; Cruz v. Water Resources Authority, 1954, 76 P.R.R. 291. If the deceit is "serious" (*dolo causante*), Civil Code, § 1222, 31 L.P.R.A. § 3409, it will give rise to an action for nullity under § 1252 of the Code, 31 L.P.R.A. § 3511. (Sections 1242–51 of the Code, 31 L.P.R.A. §§ 3491–3500, also provide for what in Puerto Rico is termed an action for "rescission," but this is a different matter, which is not relevant here. See Municipality of Ponce v. Vidal, 1945, 65 P.R.R. 346). We think it clear that it is the action for a declaration of nullity, and not of inexistence, that would be Commonwealth's remedy under the law of Puerto Rico. See Agostini v. Philippi, 1910, 16 P.R.R. 630. The Code further provides for the restoration, upon nullification, of "the things which have been the object of the contract with their fruits, and the value with its interest * * *," subject to certain other sections not here applicable. Civil Code, § 1255, 31 L.P.R.A. § 3514. The only case we have found permitting restoration in money rather than-

Since Commonwealth failed to raise a substantial issue as to the making or the existence of the contracts, it was not entitled to a preliminary stay of the arbitration proceedings. Similarly, since the preliminary injunction against Lummus rested on the granting of the preliminary stay it, too, must be vacated. No other reason for staying the arbitration has been shown. Commonwealth has not contended that Lummus' claim does not constitute an arbitrable issue within the broad provisions of the clause here in question. We believe that this question, if there could be one, is therefore foreclosed to it. We also rule that as a matter of construction Commonwealth's claims are within the scope of the arbitration clause. We have seen that under the New York cases the issue of fraud is not in itself non-arbitrable. We think that the clause here—"any controversy or claim arising out of or relating to this

Agreement * * * "—is . sufficiently broad to include a claim for damages based on fraudulent inducement, particularly when many of the fundamental issues involved are basically the same as would have been raised had the claim been cast as one for breach of contract. See M. W. Kellogg Co. v. Monstanto Chemical Co., supra.[22] As no motion to compel arbitration is before it, we believe that the proper course is for the district court to stay its own proceedings. See Landis v. North American Co., 1936, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153. If all the issues between the parties are arbitrated, or otherwise disposed of, this suit can eventually be dismissed. If, for some reason, no such solution occurs, Commonwealth can then pursue its action.

A question remains as to the appeals from the orders of June 19 and July 17. These orders expired by their terms when

in specie is, on its facts, well within the exceptions recognized by common-law jurisdictions. Forteza & Co. v. Colon, 1926, 35 P.R.R. 269. The Civil Code also provides for the ratification or confirmation of a contract by conduct inconsistent with an intent to seek nullification. Civil Code, §§ 1261–65, 31 L.P. R.A. §§ 3520–24; Sucn. Del Moral v. Mayaguez L.P. & Ice Co., 1939, 54 P.R.R. 141, 149. In major respects, therefore, we find the civil law to be parallel to the common law. The only difference we have discovered is one which would affect Commonwealth adversely. That is, that the action for a declaration of nullity based on deceit is subject to an extremely rigid statute of limitations of four years "from the date of the consummation of the contract." Civil Code, § 1253, 31 L.P.R.A. § 3512. Apparently the running of the statute is not tolled during the period when the injured party is not aware of the deceit. See Rivera v. Heirs of Diaz, supra, at 199 (concurring opinion) ; Guzman v. Guzman, supra, at 649. Once the action is barred, the contract is deemed valid for all purposes. Agostini v. Philippi, supra. It would then follow that Commonwealth could not nullify the first contract, which was executed July 8, 1954, affective December 3, 1953. We do not pursue the question of whether a court in Puerto Rico would also apply this statute of limitations to a cause of action which might be

thought to be governed by New York law. See Restatement, Conflict of Laws § 347 (1934); Restatement 2d, Conflict of Laws (Tentative Draft No. 6, 1960) § 334b.

22. Wrap-Vertiser Corp. v. Plotnick, supra, is not to the contrary, as the clause there was quite different. Nor is the statement in Lipman v. Haeuser Shellac Co., supra "that all acts of the parties subsequent to the making of the contract * * * lie exclusively within the jurisdiction of the arbitrators." [289 N.Y. 76, 43 N.E.2d 819]. The court was there holding that under a clause reading "any and all controversies in connection with, and/or arising out of, this contract," the defense of cancellation was for the arbitrators. Viewed in the light of that holding the court was expressing a broad, not a restrictive, arbitral jurisdiction. As the court went on to say, "this language would appear sufficiently broad to express the intention of the parties to include within the exclusive jurisdiction of the arbitrators as a general rule all acts by the parties giving rise to issues in relation to the contract, except the making thereof." 289 N.Y. at page 80, 43 N.E.2d at page 819. Since we have ruled out rescission in the case at bar, the "making of the contract" is not in issue in the sense used by the court in Lipman.

the court entered its order of July 20. If we were to dismiss these appeals as moot, conceivably some contention of *res judicata* might be predicated on what had been determined therein, see United States v. Munsingwear, Inc., 1950, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36; Kelaghan v. Industrial Trust Co., 1 Cir., 1954, 211 F.2d 134, notably, perhaps, issues involved in the order of July 17 which we are not deciding. While the likelihood of this may be remote, in view of the fact that the same errors that cause us to vacate the order of July 20 "infected" these earlier orders, we will make a similar disposition.

Judgments will be entered vacating the orders of the District Court.

### On Rehearing

ALDRICH, Circuit Judge.

■ Commonwealth has petitioned for rehearing, alleging that the court has "materially misapprehended" the record, and that it has decided questions on which the district court was to take "further evidence." It first alleges that we could not decide, meaning should not have decided, whether restoration in specie was required. It points out that some things in fact could not be restored, and that others, not having been acquired from Lummus, did not have to be (Lummus having acted, in purchasing and paying for certain material, as Commonwealth's agent, and not as a vendor). It adds that the time was not ripe in any event to determine what restoration was called for, and charges the court with having "conclude[d] that restoration of the entire refineries be required." This is not a correct reading of our opinion. Rather, we decided that Commonwealth was not really pursuing a restitutionary remedy—a deduction there has been no serious attempt to refute—but that the true nature of the action was an endeavor to recover damages while rescinding the arbitration agreement alone. Possibly we did not adequately express our views on the New York law. Although we recognize that New York may regard an arbitration clause as falling upon a rescis-

sion of the principal agreement, we do not believe that it would carry this to the point of permitting (where the fraud in no way related to it) what in effect would be a true rescission of the arbitration clause only. The petition for rehearing confirms our belief that this is what Commonwealth is seeking.

■ The next portion of the petition we find somewhat extraordinary. Having, as we pointed out, alleged fraud in the district court in the vaguest and most general of terms, Commonwealth now submits an affidavit as to what, specifically, at least in part, the fraud consisted. Then it submits an affidavit that this particular matter was discovered only in March 1959. It asserts that these affidavits should now be accepted to "preserve the court's appellate jurisdiction." There is no explanation why they were not submitted earlier, except some suggestion that the issue of the date of discovery was not ripe. However, Commonwealth's original brief did not suggest this issue was not ripe, but contended, quite ineffectually, that the record was adequate. We have devoted a sizable portion of the past several months to the complexities of this unusually difficult case. If we have erred on the record before us, we would wish to reconsider. But we have no desire to consider a new record at this stage. The affidavits will not be received.

Commonwealth's last contention is that, "Since the Court below was the first court to take hold of this matter and is the only court in which Commonwealth's claims are pending, the District Court should not stay its own proceedings unless and until Lummas establishes that Commonwealth's claims are arbitrable under the terms of the arbitration clause." What Commonwealth has partly in mind is that the arbitration clause excludes the arbitration of "claims or damages for which either party has contracts of insurance protecting their respective interests." Commonwealth fears that our statement in footnote 1, ("No issue has been raised with respect to the last sentence and we assume it

has no applicability to the claims here involved."), will foreclose it from contending that some of its claims against Lummus are not arbitrable because Lummus is protected by insurance. We of course had no such intention. We merely assumed that there was no insurance because no point was made of it. But Commonwealth goes further. It alleges that we also, in effect, decided this issue when we stated that the court below should now stay the proceedings before it, apparently overlooking the last two sentences of the penultimate paragraph of the opinion.

██ Basically, Commonwealth contends that the court could not stay its proceedings without a motion to that effect by Lummus. It is true that Lummus could have made such a motion as one of the means by which it could compel arbitration. But Lummus already has an action pending in New York to accomplish this very thing. The stay that we indicated is not the equivalent of the stay which would be entered upon a motion for a stay of the action under an arbitration statute. Such a stay would indeed settle all questions of arbitrability. The stay we suggested is based on the belief that there should be no further duplication of litigation in two Federal courts of concurrent jurisdiction. We intimated at the beginning of our opinion that there would have been sound reasons for the court below to have deferred initially to the New York court. Clearly now that certain issues in the case have been decided,* we see no reason for the court below to remain as the court which will supervise whatever arbitration is to be had. Under the terms of the arbitration agreement arbitration will take place in New York. New York law will be controlling. We think that a court in New York should supervise the arbitration.

The petition for rehearing is denied.

* It seems late for Commonwealth to suggest that the general scope of the arbitration clause was not before the court. But we have not decided that some spe- cial exception might not exist, of which damage claims covered by insurance is an obvious example.