PITTSBURGH & LAKE ERIE RAILROAD COMPANY, a corporation, and Lake Erie & Eastern Railroad Company, a corporation, Plaintiffs,

v.

BROTHERHOOD OF RAILROAD TRAINMEN, C. P. Savage, Individually and as Deputy President, Lodges 181, 231, 632, 954 of the Brotherhood of Railroad Trainmen, W. Haddix, J. L. Sheridan, D. J. Patterson, L. J. Neff, and Steve Drago, individually and as representatives, Defendants.

Civ. A. No. 18360.

United States District Court
W. D. Pennsylvania.
Dec. 14, 1959.

James R. Orr, and D. B. Heard (of Reed, Smith, Shaw & McClay), Pittsburgh, Pa., for plaintiffs.

Albert D. Brandon, Oliver, Brandon & Shearer, Pittsburgh, Pa., for defendants.

McILVAINE, District Judge.

There is little dispute as to the facts in this proceeding. On August 4, 1958, the National Mediation Board received a telegram from President W. B. Kennedy of the Brotherhood of Railroad Trainmen reading as follows:

> "Account failure to reach an interpretation of discipline rule resulting in management inflicting discipline without first giving the employee a fair and impartial hearing as contemplated by the rule, also failure to reach settlement in revising the freight rule in the Youngstown District due to the Electronic Yard at Struthers, Ohio, have authorized train and yard men, Pittsburgh and Lake Erie Railroad, withdrawn from service six a. m., August 8, 1958."

On the same date the Board proffered its mediation services under the provisions of Section 5, First (b) of the Railway Labor Act, 45 U.S.C.A. § 155, subd. 1(b), on the dispute described in Mr. Kennedy's telegram as Case E–174 and requested the Brotherhood to postpone the strike date. The strike date was postponed in a telegram to the Board from Mr. Kennedy, dated August 5, 1958.

On the same date, August 5, 1958, the Pittsburgh and Lake Erie Railroad Company and The Lake Erie and Eastern Railroad Company, through their Director of Personnel, R. E. Black, made formal application for this Board's mediation services under Section 5 of the Railway Labor Act in a dispute described in Exhibits "A" through "G" attached to the formal application. This application was received in the Board's office on August 7, 1958, and was incorporated into Case E–174.

Through subsequent correspondence the Board ascertained that this dispute involved three requests of the Brotherhood for changes in rules and working conditions, also the adjustment of a considerable number of time claims.

Case E–174 was set for handling by a mediator on August 18, 1958, in Pittsburgh. The carrier representatives took the position that the three requests of the organization for changes in rules and working conditions had not been properly served by the organization under Section 6 of the Railway Labor Act.

Mediation was recessed on August 21, 1958, for consideration by the Board of the carrier's contention.

On October 16, 1958, the Board ruled in a letter addressed to the representatives of the carrier and the organization that the three requests made by the organization for changes in rules and working conditions had been made in a form which satisfied the provisions under Section 6 of the Railway Labor Act and could be considered as proper notices thereunder.

The Board then assigned this dispute to a mediator for further handling which commenced in Pittsburgh on November 13, 1958. At that time the carrier took the position that the request of the organization for changes in the handling of cabooses at its East Youngstown Yard was a request involving additional expense which would be barred by the moratorium provisions of the national agreement between the carrier and the Brotherhood of Railroad Trainmen, dated April 5, 1957.

Mediation was recessed on November 20, 1958, for further consideration of the carrier's position by the Board. The carrier's contentions were considered by the Board in Executive Session on December 19, 1958, and the Board decided to docket the three requests for rules changes including the question of handling cabooses at its East Youngstown Yard as Case A–5927, and informed the parties that further mediation efforts would be extended.

A mediator was again assigned to this dispute on February 4, 1959. At that time the carrier representatives reiterated their position that the request of the organization for handling of cabooses at East Youngstown was barred by the moratorium provisions of the national agreement, above referred to, and informed the Board they were taking that question to the Disputes Committee set up under the national agreement of April 5, 1957. Mediation was again recessed for Board consideration on February 19, 1959. Following a decision made by that Disputes Committee, the Board

again set this case for mediation commencing on April 14, 1959.

At this juncture the carrier took the position that the request of the organization for the changes in the handling of cabooses at East Youngstown was a question involving the interpretation of Article 10 in the carrier's agreement between the parties, and should be sent to the First Division of the National Railroad Adjustment Board, although the carrier had previously taken the position that the request was for a rule which was barred by the moratorium provision of the April 5, 1957 agreement.

The National Mediation Board reviewed the entire handling of this dispute since its inception on August 5, 1958, and decided that a proffer of arbitration should be made to the parties under the Railway Labor Act on the three requests for changes in rules and working conditions including the item for handling of cabooses at East Youngstown.

This arbitration offer was made to the parties in the Board's letter of June 30, 1959. Arbitration was declined by the Brotherhood of Railroad Trainmen on July 10, 1959. The Board so informed the carrier and the organization in its letter of July 14, 1959, and on August 14, 1959, closed its file on Case A–5927 on account of refusal of the organization to arbitrate this dispute.

It will be noted from the above that when the Board proffered its mediation services under Section 5, First (b) of the Railway Labor Act on August 5, 1958, the Board had no knowledge of what items were in dispute between the parties. This information was developed after the proffer of mediation had been made, and was contained in the correspondence accompanying the Carrier's formal application for mediation, dated August 5, 1958.

When the items in dispute were clarified, the Board separated the requests for changes in rules and working conditions on which the carrier had made formal application for mediation from

the docket of time claims, et cetera, and docketed these items 'as Case A–5927. The docket of claims remained under Case E–174.

The Board thereupon followed the customary procedure under Section 5 of Railway Labor Act in conducting mediation on these requests of the organization and when mediation was unsuccessful offered arbitration, as above stated.

When the organization set its last strike date for 6:00 a. m., Wednesday, December 9, the Board proffered its mediation services under Section 5, First (b) in a telegram to the parties dated December 8, 1959.

 When the Restraining Order was issued, we felt that one substantial legal question was involved, to wit:

Does the Railway Labor Act intend that the provisions of the Act should apply a second time, upon emergency mediation by the Board, after the Board has previously pursued all these procedures in mediation upon application of a party to the dispute, and had closed its file on August 14, 1959, and where the strike date was set for December 9, 1959?

In other words, does the statutory scheme give any indication that Congress intended that the procedural provisions and prescriptions should apply a second time, upon emergency mediation by the Board after having previously pursued all these procedures in mediation engaged in on application of a party to the dispute? No case in point has been submitted, nor has been found by the Court, and in only one case has the judicial decision relevant to this question of statutory construction been reported.

Of course, the merits of the dispute between the Company and the Union are not before the Court. We are only concerned with the propriety of whether or not an injunction should be granted. In issuing the temporary restraining order, we stressed,

" '* * * is, by its very nature, interlocutory, tentative, provisional * * * not fixed or final or conclu-

sive, characterized by its for-the-time-beingness.' Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, 742." Railroad Yardmasters of America v. Pennsylvania Railroad Co., 3 Cir., 224 F.2d 226, 229.

It should be remembered that the Railway Labor Act was passed to aid the labor movement in the United States. It has the sanction of labor leaders and especially labor people connected with this industry. It guarantees the Union and the employees many rights. While it may have been primarily designed for the protection of employees, it also gives the employer certain rights in return for that. Actually, while both carriers and unions may properly urge that the 1934 Railway Labor Act was passed to protect their respective rights, it was intended to effectuate a much broader purpose. As stated by Justice Stone in Virginian Railway Company v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789, 802:

"More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. That is testified to by the history of the legislation now before us, the reports of committees of Congress having the proposed legislation in charge, and by our common knowledge. Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved * * *. The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief * * *."

It has had a long and successful history in dealing with labor disputes within the industry.

At my request the National Mediation Board through the United States Attorney has filed a brief as amicus curiae. As they point out:

"Section 5, First, of the Railway Labor Act, 45 U.S.C. 155, First, provides that either party to a dispute between a group of employees and a carrier may invoke the services of the National Mediation Board (a) in case of a dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference, or (b) in case of any other dispute not referable to the National Railroad Adjustment Board and not adjusted in conference between the parties. The section also provides that the Board 'may proffer its services in case any labor emergency is found by it to exist at any time.'

"The section specifies the procedural steps which are requisite following invocation or proffer of the Board's services. The Board shall promptly put itself in communication with the parties to the controversy and shall use its best efforts, by mediation, to bring them to agreement. If it fails to bring about a settlement, it shall at once endeavor "as its final required action" to persuade the parties to submit their controversy to arbitration. If one or both parties refuse arbitration, the Board shall immediately notify both parties in writing that its mediatory efforts have failed, and for 30 days thereafter working conditions and practices are to remain as they were at the time the dispute arose.

"In controversies of the type which come before the Board under Section 5, First, successful termination through mediation or arbitration requires some willingness by the parties involved to adjust or compromise, the points in dispute. Realization that failure to achieve settlement will lead, or is likely to lead, to strike action at the end of a 30-day stand-still period puts upon both parties pressure to avoid the consequences of this kind of economic warfare, seriously injurious to each of them.

"Such pressure would be materially dissipated if the statute means that after the procedures specified by Section 5, First, have been pursued to the end without avail, a subsequent proffer by the Board of its mediation services on the eve of a strike requires a repetition of these procedures and a second 30-day waiting period following notification of termination of the Board's emergency mediatory efforts. The parties would be aware that failure to effect settlement would not necessarily bring matters to a head 30 days thereafter. There would be the expectation that a strike called following termination of the required 30-day stand-still period would lead to a proffer of emergency mediation, and a repetition of the section's procedures and a second 30-day stand-still period.

"Emergency mediation itself would, in the Board's view, lose much of its efficacy if failure therein meant that there would be an ensuing 30-day waiting period, with the possibility that at the end of this period there would be another proffer of emergency mediation giving rise, on failure, to a third 30-day waiting period.

"They have cited to us below seven relatively recent successful emergency mediations after lack of success in mediation undertaken on the application of one or both of the parties.[1] The Board regards its success in such emergency mediation as largely due to the pressures operating on both parties where the consequences of failure are both serious and

---

1. E–89, Pan American World Airways, Inc. and Air Line Pilots Association.
2. E–124, Braniff Airways, Inc. and Air Line Pilots Association.
3. E–126, Chicago, North Shore & Milwaukee Railway and various non-operating railway labor organizations.
4. E–130, Braniff Airways, Inc. and International Association of Machinists.
5. E–138, New York Central System and American Railways Supervisors Ass'n.
6. E–149, Western Air Lines, Inc. and Air Line Pilots Association.
7. E–158, Southern Pacific Company (Pacific Lines) and Order of Railway Conductors and Brakemen.

immediate. This would not be the situation if failure of emergency mediation resulted in the starting of another 30-day waiting period.

"In each of the seven successful emergency mediations previously referred to, the Board's action manifested that it construed the statute as providing for only one go-around of Section 5, First, procedures, including its 30-day waiting period. In each of these cases the Board requested the labor union involved to postpone its strike date pending mediation. If the fact of emergency mediation, after prior failure of mediation on application of the parties, brought about a stand-still until the emergency mediation had failed and for 30 days thereafter, it was neither necessary nor appropriate for the Board to request postponement of the strike date. Furthermore, in substantially all of these instances the union acceded to the Board's request on the understanding that, if the emergency mediation failed, the employees would be free to strike immediately upon such failure.

"The Board's construction of the statute in the instances cited exemplifies what has been the Board's long-continued and consistent interpretation. Of course, great weight is given the interpretation placed upon a statute by the administrative agency charged with its enforcement. Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796; United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345.

"In Toledo, P. & W. R. R. v. Brotherhood of Railroad Trainmen, 7 Cir., 132 F.2d 265, 271, one of the issues was whether the district court had violated Section 8 of the Norris-LaGuardia Act, 29 U.S.C.A. § 108, by granting an injunction against a strike by railroad employees. Section 8 bars grant of injunctive relief to any complainant 'who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question.' The Court considered only whether the plaintiff railroad's refusal to arbitrate the dispute was a failure to comply with an 'obligation imposed by' the Railway Labor Act. 132 F.2d at page 271. But if that Act means that upon failure of emergency intervention by the National Mediation Board, following failure of its mediatory efforts undertaken at the invocation of one or both parties, there must be a second stand-still period, the railroad unmistakably failed to comply with an obligation—observance of the second stand-still period—imposed by the Railway Labor Act.[2] Thus the court, by affirming the district court's injunction, implicitly held that the emergency intervention did not give rise to a second stand-still period.

"In Brotherhood of Railroad Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 64 S.Ct. 413, 416, 88 L.Ed. 534, this Court reversed the decision of the court of appeals, but it did so, not upon the ground of the railroad's failure to observe the required 30-day stand-still period, but on the basis of the further provision of Section 8 of the Norris-LaGuardia Act, which declares that no injunctive relief shall be granted to a complainant who has failed to make 'every reasonable effort' to settle the dis-

2. "The Board's services were invoked on January 15, 1941, in a dispute occasioned by the railroad's announcement of a schedule of new rules, working conditions and rates of pay. On November 21, 1941, the Board notified the parties that mediation had been unsuccessful and arbitration had been refused. On December 21, 1941, immediately following the required 30-day stand-still period, the railroad gave notice that it would put its schedule into effect on December 29. But prior to this notice the Board had proffered its services in the 'national emergency' created by the bombing of Pearl Harbor on December 7, which emergency intervention failed some time prior to December 29. Accordingly, the railroad undertook to change its rates of pay, rules and working conditions short of 30 days after the failure of emergency intervention.

"For the facts here stated, see 132 F.2d at page 272, and 321 U.S. at page 52, 64 S.Ct. at page 415.

pute by negotiation or with the aid of governmental machinery or voluntary arbitration. If the railroad's noncompliance with the 30-day waiting period of Section 5, First, of the Railway Labor Act had been a bar to injunctive relief, this Court would have had no occasion to reach the question upon which it rested its decision." Memorandum of National Mediation Board filed in Supreme Court No. 100 October Term, 1959, pp. 4–9, 80 S.Ct. 56.

This Court finds that the statutory scheme gives no indication that Congress intended that the procedural provisions and prescriptions of Section 5, First, should apply a second time, upon emergency mediation by the Board, after the Board has previously pursued all these procedures in mediation upon application of a party to the dispute. This Court believes that to give the statute this construction would limit its effectiveness and would therefore be contrary to the purposes declared in Section 2 of the Act, 45 U.S.C.A. § 151a. This Court rejects a construction that would give a second go around because to do so would be inconsistent with the settled administrative interpretation and with the construction of the statute implicit in the decisions rendered in the Toledo case.

██ At the hearing it developed that the Executive Secretary of the Board, Mr. E. C. Thompson, took the position that while the Board's interpretation of the Act was as described above that, nevertheless, once they had proffered emergency mediation that the parties were still under the Railway Labor Act and in effect an injunction should lie until they closed their file on the emergency mediation which they were engaged in. His interpretation of the Board's powers does not seem in conformity with the rationale of the brief submitted by the Government in behalf of the Board, although this particular phase was not mentioned directly in the brief.

Be that as it may, the right to emergency mediation could only continue for a reasonable length of time or the Board in effect would be asserting the power which they deny they have the right to do; that is, to continue the period of the status quo for a second 30-day period.

On December 9, 1959, the Mediation Board continued its efforts to reach an amicable settlement, and thus a 4-day intervening period has already elapsed during which this emergency mediation has continued. To say that this would continue indefinitely would be giving a power to the Board which Congress did not intend.

Nothing in the Act indicates to me a second cooling-off period while emergency mediation is pursued by the Mediation Board. However, even if I am wrong in this, this could only extend for a relatively short period, and certainly any fruits of emergency mediation have had time to ripen in the interval between the temporary restraining order and today. Especially so in this case where Mr. Thompson says nothing more remains to be done by the Board except the formal closing of the case. In addition, the Union here has informed the Court that there will be no strike prior to Wednesday, December 16, 1959, at 4:50 p. m. E.S.T. Certainly continued efforts to settle a dispute that affects the public interest by the Mediation Board is in the public interest, but Congress has not seen fit to delay the right to strike while such mediation is continuing.

It is undisputed that this dispute is the same dispute previously mediated unsuccessfully by the Board.

Nothing in this proceeding has indicated that either party to the dispute feels that the Mediation Board should have invoked Section 10 of the Act, nor has there been any indication in this proceeding that the judgment of the Mediation Board was to be exercised to invoke the provisions of the said section, which provides that they shall notify the President, who then may thereupon in his discretion, create a Board to investigate and report respecting such dispute.

██ It is conceivable that an "old" dispute involving the same set of facts

could become a "new" dispute if one or both of the parties slept on their rights (in this instance the right to strike) for a considerable period of time. Laches could bar the plea of previous mediation. To allow the interruption of a vital public service with in fact no warning could cause great harm to those dependent on the service. But to hold that the strike must be called on the exact expiration date of the provisions of the Act would also be against public policy. Continuation of negotiations for a reasonable period should be encouraged. Here we find no unreasonable delay on the part of the Union so as to make this dispute subject to a new enforcement of the procedures to the Act.

The temporary restraining order issued December 9, 1959, is vacated, and the request for injunction refused.

This Memorandum shall serve as the Court's findings of fact and conclusions of law.