**PAN AMERICAN WORLD AIRWAYS, INC., Appellee,**

v.

**FLIGHT ENGINEERS' INTERNATIONAL ASSOCIATION, PAA CHAPTER, AFL–CIO, Appellant.**

**Petition of FLIGHT ENGINEERS' ASSOCIATION, PAA CHAPTER, AFL–CIO, for a Writ in the Nature of Prohibition.**

No. 398, Dockets 27657, 27658.

United States Court of Appeals Second Circuit.

Argued July 16, 1962.

Decided July 25, 1962.

Daniel Kornblum, New York City, and William Peer of Zimring, Gromfine & Sternstein, Washington, D. C., for appellant.

Herbert Prashker of Poletti, Freidin, Prashker & Harnett, New York City (Eric Rosenfeld, Richard H. Borow and Noel B. Berman, New York City, of counsel, on the brief), for appellee.

Before LUMBARD, Chief Judge, and MOORE and HAYS, Circuit Judges.

HAYS, Circuit Judge.

This is an appeal from orders of the District Court for the Eastern District of New York granting a temporary restraining order against a strike by appellants and extending the order from time to time. The appellants seek, in the alternative, a writ in the nature of a writ of prohibition. Cf. Lummus Co. v. Commonwealth Oil Refining, 297 F.2d 80 (2d Cir. 1961), cert. denied, Dawson v. Lummus Co., 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962). We do not pass upon the alternative petition since we hold the orders appealable.

■■ We consider first our jurisdiction to entertain this appeal. Ordinarily there can be no appeal from the issuance of a temporary restraining order. Grant

v. United States, 282 F.2d 165 (2d Cir. 1960); Connell v. Dulien Steel Prods., Inc., 240 F.2d 414 (5th Cir. 1957), cert. denied, 356 U.S. 968, 78 S.Ct. 1008, 2 L. Ed.2d 1074 (1958); 7 Moore, Federal Practice ¶65.07 at 1649 (2d Ed.1955). In the present case we hold the orders appealable under 28 U.S.C. § 1292(a) (1) as an order granting an injunction.

On June 22, the lower court signed an order to show cause setting a hearing on a motion by Pan American to enjoin a threatened strike by the Flight Engineers. The order to show cause contained a temporary restraining order prohibiting the strike until June 26. On June 26, the court, having commenced the hearing on the motion for a preliminary injunction, extended the temporary restraining order to July 6, and on July 5 granted a further extension to August 1.

There is no statutory authority for the indefinite, successive extensions of temporary restraining orders. Rule 65(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., provides that a temporary restraining order

> "shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period. * * * "

See United States v. United Mine Workers, 330 U.S. 258, 301, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

Since the order here under consideration was extended far beyond the limits prescribed by Rule 65(b) we need not consider the applicability of Section 7(e) of the Norris-La Guardia Act (29 U.S. C.A. § 107) which provides that a temporary restraining order issued in cases growing out of labor disputes "shall be effective for no longer than five days and shall become void at the expiration of said five days."

■ Appellee argues that the time limits set forth in Rule 65(b) (and Section 7(e) of the Norris-La Guardia Act) are applicable only to situations where the temporary restraining order was issued *ex parte*. This contention was expressly rejected by the fifth circuit in Connell v. Dulien Steel Prods., Inc., supra, where the court pointed out that "this interpretation would read out of the rule the requirement of the *consent* of the restrained party to an extension beyond a second 10 day period, since it would, in effect, substitute mere notice to, or the presence of, the party for its consent."[1]  (240 F.2d at 417; emphasis in original.)  The fact that notice is given and a hearing held cannot serve to extend indefinitely beyond the period limited by the Rule the time during which a temporary restraining order remains effective.[2]  The statute contemplates that notice and hearing shall result in an appropriate adjudication, i. e. the issuance or denial of a preliminary injunction, not in extension of the temporary stay.[3]

■ The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunc-

---

1. See Commonwealth Oil Refining Co. v. Lummus Co., 174 F.Supp. 485 (D. Puerto Rico 1959), rev'd on other grounds, 280 F.2d 915 (1st Cir. 1960), cert. denied, 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225 (1960), where Judge Magruder held that he was without power to extend a temporary restraining order even one day beyond the prescribed period without the consent of the party restrained, although that party was presently in court and litigating the questions involved.

   The time limitations of the rule are not designed to protect a party from an unknown restraint for an excessive period since, if the temporary restraining order has any efficacy, the party restrained will have notice of its existence immediately after it is issued.

2. See United States v. United Mine Workers, 330 U.S. 258, 301, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Sims v. Greene, 160 F.2d 512 (3d Cir. 1947); Schainmann v. Brainard, 8 F.2d 11 (9th Cir. 1925); Commonwealth Oil Refining Co. v. Lummus Co., supra note 1.

3. Sims v. Greene, 161 F.2d 87 (3d Cir. 1947) ("notice" implies hearing, trial of the issues and preliminary decision).

tion. Such an order is necessarily limited to a very brief period because what may later prove to be a right of the party who is restrained is suspended before even a tentative adjudication as to that right has been had. A union, for example, may have a perfect right to strike and may have chosen a particularly opportune time for doing so. By the issuance of a temporary restraining order a court, without adjudicating the basic right, prohibits the strike. The longer the period of such prohibition the greater the chance that the right will be completely frustrated because the opportunity once suspended may, as a practical matter, be lost. And frequently recovery on the bond will not compensate adequately for the suspension or loss of the right involved. It is because the remedy is so drastic and may have such adverse consequences that the authority to issue temporary restraining orders is carefully hedged in Rule 65(b) by protective provisions. And the most important of these protective provisions is the limitation on the time during which such an order can continue to be effective.

It is for the same reason, the possibility of drastic consequences which cannot later be corrected, that an exception is made to the final judgment rule to permit review of preliminary injunctions. 28 U.S.C. § 1292(a) (1). To deny review of an order that has all the potential danger of a preliminary injunction in terms of duration, because it is issued *without* a preliminary adjudication of the basic rights involved, would completely defeat the purpose of this provision.

We hold, therefore, that the continuation of the temporary restraining order beyond the period of statutory authorization, having, as it does, the same practical effect as the issuance of a preliminary injunction, is appealable within the meaning and intent of 28 U.S.C. § 1292 (a) (1). Sims v. Greene, 160 F.2d 512 (3d Cir. 1947); Missouri-K-T R. R. Co. v. Randolph, 182 F.2d 996 (8th Cir. 1950); Western Union Telegraph Co. v. United States and Mex. Trust Co., 221 F. 545, 553 (8th Cir. 1915); Grant v. United States, supra, 282 F.2d 167-168 (dictum); see 7 Moore, Federal Practice, ¶ 65.07 (2d Ed.1955); 3 Barron & Holtzoff, Federal Practice and Procedure, § 1440 (Wright ed. 1958).[4]

There is no real dispute on the facts and we accept, for purposes of this opinion, the facts as stated by Pan American, the appellee.

Pan American and the Flight Engineers' International Association had a collective agreement dated October 25, 1957, which provided for reopening on June 1, 1960. At an appropriate time prior to the reopening date each of the parties served upon the other a notice of proposed changes as required by Section 6 of the Railway Labor Act (45 U.S.C.A. § 156). (Such notices are referred to in the industries covered by the Act as "Section 6 notices.")

The Section 6 notice of the Flight Engineers was a document of 25 pages requesting detailed changes in the provisions of the collective agreement referring to wages, hours, rules and working conditions generally. Pan American, in its Section 6 notice, also asked for extensive changes in the working rules, etc.

In May the parties began negotiations on the proposals made in their respective Section 6 notices. When they failed to

4. Pennsylvania Motor Truck Ass'n v. Port of Philadelphia Marine Terminal Ass'n, 276 F.2d 931 (3d Cir. 1960), is not to the contrary because in that case the appeal was taken and decided before the twenty day period had expired.

See Benitez v. Anciani, 127 F.2d 121 (1st Cir. 1942), cert. denied, 317 U.S. 699, 63 S.Ct. 439, 87 L.Ed. 559 (1943) and Southard & Co. v. Salinger, 117 F.2d 194 (7th Cir. 1941) where the courts, upon finding that temporary restraining orders had expired by virtue of the Rule 65(b) limitations, held that there was no existing order to review and dismissed the appeals as moot. In the present case, because the district judge extended the order beyond the twenty day period, we consider that the temporary restraining order became an appealable preliminary injunction.

reach agreement they invoked the services of the National Mediation Board, as required by the Railway Labor Act (45 U.S.C.A. § 156). On May 31, 1960 the National Mediation Board docketed the case and on and after August 2 an assigned mediator took part in the negotiations sessions. The mediation procedure continued until February, 1961.

On February 17, 1961 the National Mediation Board informed the parties that the President, pursuant to Section 10 of the Railway Labor Act (45 U.S.C.A. § 160) had appointed an Emergency Board to consider their dispute. The Emergency Board held hearings from April 24 to June 8, 1961. On June 20, 1961 the Emergency Board issued its report. The statutory thirty day waiting period after the Emergency Board's report thus expired on July 20, 1961.

In the meantime, on February 17, 1961, the Flight Engineers struck Pan American. The district court on February 18 issued a temporary restraining order and the strike was terminated. This order was continued by stipulation (see Rule 65(b), Federal Rules of Civil Procedure) from time to time until July 25, 1961, when the court declined to extend the order further, saying that the Flight Engineers were now "free to strike" (the statutory thirty day period following the Emergency Board report having elapsed).

Thereafter negotiations continued with sessions being held from time to time. Undersecretary of Labor Wirtz attempted mediation throughout the spring of 1962, and Secretary Goldberg met with the parties in June. When these efforts resulted in no agreement the Flight Engineers called a strike which began on June 23 and was terminated later the same day as a result of the order now under consideration.

In the course of this long period of negotiation a set of issues was injected which had not been included in the original Section 6 notices of April and May 1960. Prior to that time the agreements of Pan American with the Flight En-

gineers and with the Airline Pilots Association included provision for a cockpit crew on jet planes consisting of four men, three pilots and a flight engineer. Pan American believed that the third pilot was unnecessary. Since this position did not affect the status of the flight engineer, Pan American did not include any reference to it in its Section 6 notice to the Flight Engineers. But the issue of the fourth man in the cockpit remained in the background as a subject of concern for the airline and for both of the unions.

One aspect of this controversy was involved in a decision of the National Mediation Board on February 6, 1961 in a case involving United Air Lines in which the Board held that the pilots and the flight engineers employed on that line constituted a single craft or class of employees for the purpose of collective bargaining under Section 2, Ninth of the Railway Labor Act (45 U.S.C.A. § 152, Ninth). Shortly after that decision, and, it is alleged, as a protest against it, the Flight Engineers began a strike against Pan American and several other airlines. (This is the strike which as far as concerned Pan American was ended by the temporary restraining order of February 18, 1961, referred to above.) The Secretary of Labor after conferring with representatives of the airlines, the Flight Engineers and the Airline Pilots, recommended to the President the appointment of a special commission to consider as a whole what had come to be known as the crew complement problem.

In accordance with Secretary Goldberg's recommendation the President appointed the so-called Feinsinger Commission which sought to effect an agreement among the parties on the crew complement issue. On October 17, 1961 the Commission, having failed to get agreement following the issuance of its preliminary report of May 24, 1961, reported to the President its final recommendations for resolution of the issue. We need not here be concerned with the details of these recommendations. It is sufficient to say that the recommenda-

tions were "accepted" by Pan American while the Flight Engineers were willing to accept them only with certain important qualifications.

From October 17, 1961 on, the negotiations between the parties, frequently with the aid of Chairman Feinsinger and Undersecretary Wirtz, were concerned with the crew complement issue as well as with the issues originally posed by the Section 6 notices. There were two points with respect to the crew complement issue on which the Flight Engineers were unyieldingly insistent. They refused to accede to Pan American's proposals on this issue unless Pan American agreed that the third man in the cockpit should have a special license called an "A & P license" and that furloughed engineers would be recalled to duty before the third seats were filled by pilots. For Pan American to yield on these points was made more difficult by an arbitration award rendered May 21, 1962, in an arbitration between Pan American and the Airline Pilots Association. Pan American could, of course, have settled the issue at any time by continuing to fly with four-man crews.

During this long period of negotiations between Pan American and the Flight Engineers, negotiations continued between the Flight Engineers and other airlines, and these negotiations were also concerned with the crew complement problem. Trans World Airlines and the Flight Engineers finally reached an agreement which was announced by the Secretary of Labor on June 21, 1962. On June 22 the Pan American Chapter of the Flight Engineers issued a statement characterizing the Trans World settlement as "completely unacceptable" to them. Pan American also found the Trans World settlement unacceptable.

Only one other episode need be mentioned in this brief résumé of operative facts. On June 22, after the Flight Engineers had announced that they would strike the next day, the National Mediation Board proffered its services to the parties, calling their attention to those provisions of Section 6 of the Railway Labor Act which require the parties "to maintain status quo until the controversy has been finally acted upon as required by Section 5 of the Act by the National Mediation Board." The Flight Engineers accepted the offer of services, subject to the qualification that such acceptance would not be deemed a waiver of the right to strike. On June 25, the parties met with the Secretary and Undersecretary of Labor and with a member of the National Mediation Board in a further fruitless effort to resolve the dispute.

■■ The Railway Labor Act was designed to provide comprehensive treatment for disputes arising in the industries which are subject to the Act. With the provisions for the settlement of "minor" disputes, i. e. those arising out of the interpretation and application of existing collective agreements, we need here have no concern. Suffice it to say that the Act provides for such disputes a system of compulsory adjustment without resort to strike, and that strikes over "minor" disputes are enjoinable without regard to the limitations of the Norris-La Guardia Act. Brotherhood of Ry. Trainmen v. Chicago River & I. R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). The present controversy concededly involves a "major" dispute, i. e. a dispute as to the terms and conditions to be included in the collective agreement governing the relationship between the parties. Elgin, Joliet & E. Ry. v. Burley, 325 U.S. 711, 725, 65 S.Ct. 1232, 89 L.Ed. 1886 (1945) describes briefly the plan of the Act for the handling of major disputes:

> " 'Major disputes' go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration, cf. § 7; Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50 [64 S.Ct. 413, 88 L.Ed. 534, 150 A.L.R. 810]; and finally to possible presidential intervention to secure adjustment. § 10. For their settlement the statutory scheme retains throughout the traditional voluntary

processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration."

We may assume that the compulsion of injunction is available against strikes during the period when the National Mediation Board is attempting to mediate the dispute, and during the existence of a Presidential Emergency Board, and for thirty days after the report of such a Board. See Chicago, R. I. & P. R. R. v. Switchmen's Union, 292 F.2d 61, 66 (2d Cir. 1961); Norfolk & P. Belt Line R. R. v. Brotherhood of Railroad Trainmen, 248 F.2d 34, 45, 46 (4th Cir. 1957), cert. denied, 355 U.S. 914, 78 S.Ct. 343, 2 L.Ed.2d 274 (1958); American Airlines v. Air Line Pilots Ass'n, 169 F.Supp. 777, 787 (S.D.N.Y.1958); Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 387–91 (1960).

■ When the cooling-off procedures of the Act, including the appointment and report of the Emergency Board, if resort is had to that procedure, are exhausted and the final thirty day period has elapsed it is quite clear that the Act contemplates that further progress toward the determination of the controversy will be left entirely to the interplay of economic forces without further governmental intervention. The parties are then free from all compulsion under the Act and may resort to "self help," e. g., the union may then strike. As the Supreme Court said in Elgin, supra, "compulsions go only to insure that those procedures [i. e. the procedures of media-

tion] are exhausted before resort can be had to self-help." 325 U.S. at 725, 65 S.Ct. at 1290. The whole scheme of the Act is cast in terms of compulsory settlement of minor disputes and assistance through mediation (together with some resort, by appointment of Emergency Board, to the instruments of public pressure) in the *voluntary* settlement of major disputes, with a fixed cut-off date for the termination of such assistance, and the relegation thereafter of the parties to the use of their economic weapons. See Butte, Anaconda & Pac. Ry. v. Brotherhood of Locomotive Firemen, 268 F.2d 54, 58–59 (9th Cir.), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed. 2d 104 (1959).

■ It follows that no injunction can issue under the Act against a strike which is undertaken after the mediation processes of the Act have been completed and the time limit which is provided has elapsed. See Brotherhood of R. R. Trainmen v. Chicago River & I. R. R., 353 U.S. 30, 42, n. 24, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Elgin, Joliet & E. R. R. v. Burley, 325 U.S. 711, 724–725, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); American Airlines, Inc. v. Air Line Pilots Ass'n, 169 F.Supp. 777, 787–788 (S.D.N.Y.1958); Comment, Enjoining Strikes and Maintaining the Status Quo in Railway Labor Disputes, 60 Colum.L.Rev. 381, 387–91 (1960).

Not only is there no authority under the Act for enjoining a strike which is begun at such a time, but the express provisions of the Norris-La Guardia Act deprive the Federal courts of jurisdiction to issue such an injunction. Much has been written on the "accommodation" of the Norris-La Guardia Act to the Railway Labor Act, but the difficulties of "accommodation" arise only in connection with the compulsions of the Railway Labor Act. Where that Act prohibits (or directs) certain conduct and the Norris-La Guardia Act forbids an injunction, the contradiction between the two Acts must be reconciled. See Brotherhood of R. R. Trainmen v. Chicago River & I. R. R., supra, 353 U.S. at 40,

77 S.Ct. at 635; Chicago R. I. & P. R. R. v. Switchmen's Union, supra, 292 F.2d at 65–66; Baltimore & O. R. R. v. United R. R. Workers, 271 F.2d 87, 92 (2d Cir. 1959), remanded on other grounds, 364 U.S. 278, 80 S.Ct. 1609, 4 L.Ed.2d 1719 (1960). But where no compulsion exists under the Railway Labor Act, because its procedures have been exhausted, there can be no question of "accommodation." The limitations of the Norris-La Guardia Act are plainly applicable. Order of R. R. Telegraphers v. Chicago & N. W. Ry., 362 U.S. 330, 338–343, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960); see Butte, Anaconda & Pac. Ry. v. Brotherhood of Locomotive Firemen, 268 F.2d 54 (9th Cir.), cert. denied, 361 U.S. 864, 80 S.Ct. 122, 4 L.Ed.2d 104 (1959).

We do not understand that these propositions are disputed in the present case. Pan American seeks rather to avoid their application by demonstrating that the compulsions of the Railway Labor Act have not been exhausted.

Pan American argues that the mediation procedures of the Act have not been complied with, with respect to the crew complement issue. It is true that that issue was not included within the scope of the Section 6 notices which were exchanged by the parties prior to the June, 1960 reopening. Moreover, neither the National Mediation Board nor the Presidential Emergency Board considered the crew complement issue. That issue was injected into the situation by Pan American as the result of the discussions which led up to the appointment of the Feinsinger Commission and of the activities and report of that Commission. Indeed Pan American now claims that its "acceptance" of the recommendations of the Feinsinger Commission, as evidenced by its telegram to the President, served as a new Section 6 notice bringing the crew complement issue into the negotiations.

But even if we were to consider Pan American's "acceptance" of the Feinsinger report as a Section 6 notice we would be forced to reject the position that one of the parties to the procedures under the Railway Labor Act can, after those procedures are once exhausted, set them in motion for a second time by the service of a Section 6 notice raising new issues. Judge Bryan, in American Airlines v. Air Line Pilots Ass'n, supra, 169 F.Supp. at 797, where a second Section 6 notice raising new issues had been filed after exhaustion of mediation procedures, stated the reason for this succinctly and forcefully:

"It may be, as the Company claims, that there was some obligation on the part of the Union to bargain with respect to the Company's November 1, 1958 'opener' [i. e. the second Section 6 notice]. But that by no means prevented a strike with respect to the subject matter of the dispute which had been fully processed under the Railway Labor Act, on which the Emergency Board had acted, and concerning which the cooling-off period had expired.

"To hold otherwise would mean that each new dispute on which the parties served appropriate 'openers' would set in motion the machinery of the Railway Labor Act all over again with respect to a dispute in which the procedures of the Act had already been fully exhausted. Thus the right of the Union or the employer to use the economic pressures of strike or lockout which are forbidden only during a period when the parties have not fully performed their duties and obligations under the Act, could be postponed indefinitely."

To the same effect are Northwest Airlines, Inc. v. Airline Pilots Ass'n, 185 F.Supp. 77, 80 (D.Minn.1960) and Pittsburgh & Lake Erie R. R. v. Brotherhood of R. R. Trainmen, 179 F.Supp. 271, 275 (W.D.Pa.1959). We are cited to no authority and we find none which holds the contrary.

As was the case in American Airlines the strike of the Flight Engineers which has been enjoined is "a strike with respect to the subject matter of the dispute which has been fully processed under the

Railway Labor Act." Pan American's injection into the situation of the crew complement issue cannot be permitted to obscure the fact that the Flight Engineers struck only to secure the very demands which they made in their original Section 6 notice. Pan American's reasons for refusing these demands are obviously not a part of what the Flight Engineers struck for.

Pan American lays considerable stress on the fact that the National Mediation Board proffered its services a second time on the eve of the strike. From a brief which the Board filed as *amicus curiae* in the Pittsburgh & Lake Erie case, supra, and which is quoted extensively in the opinion in that case, it appears that the Board customarily makes such an offer of services when a strike is threatened, as it has the right to do under Section 5, First of the Railway Labor Act, which provides that the Board "may proffer its services in case any labor emergency is found by it to exist at any time." (45 U.S.C.A. § 155, First.) However, the Board argued strenuously in its *amicus* brief that such a proffer could not legally have the effect of subjecting the parties for a second time to the compulsory cooling off processes of the Act, citing in support of this position Toledo, P. & W. R. R. v. Brotherhood of R. R. Trainmen, 132 F.2d 265, 271 (7th Cir. 1942) and the opinion of the Supreme Court in that case, reversing on other grounds, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944). The Board presented another interesting and persuasive argument against a second period of compulsory abstention from use of the usual economic sanctions to resolve a dispute:

"'In controversies of the type which come before the Board under Section 5, First, successful termination through mediation or arbitration requires some willingness by the parties involved to adjust or compromise, the points in dispute. Realization that failure to achieve settlement will lead, or is likely to lead, to strike action at the end of a 30-day stand-still period puts upon both parties pressure to avoid the consequences of this kind of economic warfare, seriously injurious to each of them.

"'Such pressure would be materially dissipated if the statute means that after the procedures specified by Section 5, First, have been pursued to the end without avail, a subsequent proffer by the Board of its mediation services on the eve of a strike requires a repetition of these procedures and a second 30-day waiting period following notification of termination of the Board's emergency mediatory efforts. The parties would be aware that failure to effect settlement would not necessarily bring matters to a head 30 days thereafter. There would be the expectation that a strike called following termination of the required 30-day stand-still period would lead to a proffer of emergency mediation, and a repetition of the section's procedures and a second 30-day stand-still period.

"'Emergency mediation itself would, in the Board's view, lose much of its efficacy if failure therein meant that there would be an ensuing 30-day waiting period, with the possibility that at the end of this period there would be another proffer of emergency mediation giving rise, on failure, to a third 30-day waiting period.'" Pittsburgh and Lake Erie R. R. v. Brotherhood of R. R. Trainmen, supra, 179 F.Supp. at p. 275.[5]

---

5. Aside from the legal issues involved, and considering only the practicalities of the situation, it seems quite unlikely that, after many months of mediation efforts by the Secretary of Labor, the Undersecretary of Labor and the Chairman of the President's Special Commission, with the participation of representatives of the National Mediation Board, the Board would be able through further mediation to bring about a resolution of the dispute.

Pan American seeks also to support the issuance of an injunction against the strike on the ground that the Union has violated its obligation under § 2, First of the Act (45 U.S.C.A. § 152, First) to "exert every reasonable effort" to reach agreement.

This court held in Chicago, R. I. & P. R. R. v. Switchmen's Union, supra, where a similar contention was raised:

> "[W]hatever the general rule as to the scope of review of temporary injunctions may be, no such principle as plaintiffs advocate can be applicable to a claim that such an injunction transgresses the command of § 4 of the Norris-LaGuardia Act. That section uses the most emphatic words possible—'No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction' against a peaceful strike. To overcome that bar plaintiffs had the burden of showing, as a matter of law, that the broad command of § 4 is subject to an exception when a union has violated its duties under the Railway Labor Act and, as a matter of fact, that the defendant here had done that. They were obliged to meet that burden, not simply to show they might be able to meet it; until they met it, the court was without power to issue an injunction whether temporary or permanent." 292 F.2d at 71.

In the present case the only evidence advanced of failure to exert every reasonable effort is insistence, in response to Pan American's proposals as to crew complement, on the requirement of the "A and P license" for flight engineers. There is no claim that the Union has not met with the employer whenever requested to do so over the many months of negotiation nor that the Union has not, apart from its insistence on this one item, participated in the give and take of these negotiations in complete good faith.

As to the issue itself, it would seem on its face to be an entirely proper subject for collective bargaining and one on which either of the parties might lawfully insist. Pan American's argument to the contrary is characterized by a certain subtlety. The purpose of the Union in advancing the demand as to the "A & P license" is, Pan American says, to secure recognition of its claim to represent a separate craft or class.

Assuming that this contention finds support in the evidence (which indicates that the license demand was also advanced on the ground of safety considerations), what is there about the demand that is unlawful or reflects any lack of good faith? The Union is not defying the National Mediation Board or threatening to disregard its lawful designation of a craft or class. It is not insisting, as did the Union involved in N. L. R. B. v. International Bhd. of Elec. Workers, 119 N.L.R.B. 1792 (1958), enforced, 266 F.2d 349 (5th Cir. 1959), which Pan American cites in support of its position, on the Company's bargaining with it regardless of a decision as to the appropriate basis for bargaining. At most the Union is bargaining for the continuation of a presently existing requirement which might be considered by the Board, if the question arose, to give the flight engineers a ground for claiming to be a separate craft or class. There seems to be no more reasonable basis for objection to this than there would be under the National Labor Relations Act if plumbers, for example, insisted on the requirement of a certificate, or of being assigned certain work, because they wished to preserve their craft identity.

Pan American's single example of lack of reasonable effort to reach agreement appears, on examination, to be a completely lawful claim of the Union based upon an unexceptionable motive or purpose. It certainly falls far short of "overcoming that bar" to which we referred in the Chicago, R. I. & P. R. R. case, supra.

We reach the conclusion, therefore, that there is no authority in the Railway Labor Act for the issuance of the present injunction, and that by rea-

son of the Norris-La Guardia Act the district court was without jurisdiction to enjoin the strike. See Order of R. R. Telegraphers v. Chicago & N. W. Ry., supra.

It may well be that the Flight Engineers have been stubborn and headstrong in their disregard of the public welfare and their resistance to the efforts of the President and the Secretary of Labor to resolve this dispute. It may well be that the Act of 1934 has not been very effective in accomplishing the results which were expected of it, and that a small group of flight engineers ought not to be able to halt the operations of a great airline because of what is perhaps basically a question of representation on which the flight engineers are taking an undesirable position. But these are questions for Congress which has the duty to consider all these factors and to amend the statute to make it more effective, if that is possible. We must take the law as Congress has declared it to be.

Remanded to the district court with direction to dissolve the injunction forthwith. Accordingly our mandate shall issue forthwith.

MOORE, Circuit Judge (dissenting).

Although the facts are not in dispute, as so frequently happens, the interpretations to be derived therefrom may differ widely. It is in this area that I find myself in disagreement with my colleagues.

The importance of the subject matter of this case has been succinctly summarized recently (June 14, 1962) by the President of the United States who said:

"Eighteen hundred men [1] are threatening a strike which would cause the immediate lay-off of some 60,000 employees, the immobilization of 40 per cent of the nation's airline service, and the loss of over a million dollars a day from international flights, which our balance of payments cannot afford."

This statement followed a request which he had made five days earlier in which he said:

"It is vitally important that these disputes be settled without interruption. There would be, furthermore, no excuse for the interruption in view of the steps which have been taken, under Government auspices, to achieve a settlement which is equitable to the parties and which takes account of the public interests which are involved."

In this crisis, national and international in scope as declared by the President, the majority find the courts without power to grant relief under the law. Upon the facts as I read them and upon the law, I cannot subscribe to such a doctrine of helplessness.

The right to strike sustained by the majority arises from a Railway Labor Act (RLA) Section 6 proceeding which they assert has run its full course and, hence, leaves the flight engineers free to strike. That proceeding was initiated over two years ago (April, May, 1960) by appropriate notices which embraced generally changes in wages, hours, rules and working conditions in an agreement between Pan American and the flight engineers which was about to expire on June 1, 1960. Upon failure to reach an agreement, the dispute was referred to the National Mediation Board (NMB) which continued mediation procedures until February, 1961, when the President appointed an Emergency Board (45 U.S. C.A.A. § 160) to consider the issues involved.

However, also in February, 1961, an entirely new situation (as I see it) arose. On February 6, 1961, the NMB handed down a decision in a United Air Lines case that pilots and flight engineers constituted a single craft or class for collective bargaining purposes (Sec. 2, Ninth, RLA). In protest against this decision, the flight engineers on February 17, 1961, went out on strike against Pan American and six other airlines. On

---

1. Apparently referring to the flight engineers of Pan American, Eastern and TWA.

February 18, 1961, Pan American, claiming that the strike was a violation of the *status quo* requirement pending the Emergency Board's investigation and report, obtained a temporary restraining order enjoining the strike.

To deal with the situation created by the United Air Lines decision, the President by Executive Order on February 21, 1961, appointed a Presidential Commission (the Feinsinger Commission):

"to consider differences that have arisen regarding the performance of the flight engineer's function, the job security of employees performing such function, and related representation rights of the unions, namely, the Flight Engineers International Association and the Airlines Pilots Association * * *"

Thus, there were two separate bodies in existence, the Emergency Board considering the Section 6 issues and the Feinsinger Commission dealing with the issues outlined by the President (supra). The flight engineers concede the difference in material issues before the Board and the Commission in stating:

"[T]he so-called Feinsinger Commission was appointed wholly *outside* the procedures of the Railway Labor Act, to consider problems *not* included in the Section 6 notices."

"[T]hat the problems faced by the groups [the Emergency Board and the Presidential Commission] are different and essentially unrelated * * *"

The original NMB case based upon the Section 6 notices was closed (April 10, 1961) because of the referral to the Emergency Board. Hearings were then held between April 24, 1961, and June 8, 1961, before the Emergency Board.

In the meantime, the Feinsinger Commission issued a first report on May 24, 1961, in which it found that the cause of the strike of February 17, 1961, was the United Air Lines decision and its merger of pilots and flight engineers into a single class. If summarized the differences between the pilots and the flight engineers, stating:

"FEIA [2] insists that the carriers must not qualify pilots as flight engineers nor require flight engineers to qualify as pilots, and that all flight engineers must possess an A&P license. The ALPA position is that the carriers must give pilots training as flight engineers, that such training is not to include an A&P license, and that if a three-man crew is used on jet aircraft its third member must possess a commercial pilot license and instrument rating and be qualified to relieve the co-pilot under routine and emergency conditions."

"There is ample reason, however, to believe that FEIA is partly motivated by a desire to fence the pilots out in order to preserve its members' jobs, the craft, and FEIA's representation rights, and that ALPA is likewise partly motivated by a desire to elbow FEIA out of its representational rights and all that implies."

The Feinsinger Commission suggested that the parties negotiate on the basis of the report and advise the Commission of their progress within thirty days.

Less than a month thereafter (June 20, 1961), the Emergency Board issued its report dealing with the subject matter of the original Section 6 notices. It did not consider the questions of representation or the qualifications for the third seat in a three-man jet crew. In fact, it specifically refrained from invading the Commission's field or making any recommendations because "recommendations from this Board on matters related directly or indirectly to the Commission's current endeavors might do more harm than good." So far as the Section 6 issues originally framed were concerned under the law the time of restraint ran out on July 20, 1961. But this report encompassed only one phase of the controversy.

2. The flight engineers.

On October 17, 1961, the Feinsinger Commission issued its report with specific recommendations which the President characterized as "fair and equitable to the parties and an honorable way to a peaceful settlement of a difficult inter-union dispute which has plagued the airline industry for years." However, the flight engineers' reply included a statement on the subject of "Flight Engineer Representation," which demanded that:

"The carrier shall agree to obtain formal and express recognition of the flight engineer position as a separate class and craft without regard to any legal or contractual requirement for additional qualifications in its agreement with the pilots."

It was more than obvious by this time that the battle was over the third seat in the cockpit, the reward was representation and the contestants were the pilots and the flight engineers. The battleground was Pan American's fields which were being trodden down by the warring factions.

In April, 1962, because of a controversy between Pan American and the pilots involving the third seat and qualifications therefor, another board (the Taylor Board) entered the picture. The flight engineers were given an opportunity to participate in the arbitration agreed upon by Pan American and the pilots but declined. Following the Taylor Arbitration Board's report (May 21, 1962) and further negotiations, the President requested arbitration of unresolved issues. The flight engineers agreed to arbitrate the "economic issues" if Pan American yielded to them on the so-called A&P and furlough issues. Thereafter on June 21, 1962, a settlement of the disputes between the TWA flight engineers and TWA was announced. Shortly after this announcement, the Pan American flight engineers stated that the TWA settlement was "completely unacceptable" and that they would go on strike against Pan American and Eastern Air Lines at 2:00 P.M. on June 23, 1962. In the announcement, the flight engineers said that the TWA settlement "represents a complete abdication to the pilots of our representation rights."

On June 22, 1962, the NMB by telegram advised both Pan American and the flight engineers that it proffered its services pursuant to Section 5, First (B) of the RLA in the labor emergency. On June 25, 1962, representatives of Pan American and the flight engineers met with the Secretary and Under Secretary of Labor and a member of the NMB. The flight engineers took the position that they would not permit any "risk of loss of their representation rights." The meeting went into recess "subject to call" because of these court proceedings in which a hearing had been scheduled for June 26, 1962.

This somewhat detailed recital of the facts has been set forth because in my opinion the parties have by no means reached the barricade at the end of the mediation road upon which they were traveling in June, 1962. Originally, they had started down a Section 6 road but after the United Air Lines decision they had definitely crossed over to a separate although parallel road. The Emergency Board recognized this and Judge Rayfiel in his "free to strike" statement relating to the Section 6 proceedings said that it was without prejudice to Pan American's right to renew its motion for a preliminary injunction and that if a new application were made "[he] would entertain it, and [he] would not regard the matter as having been adjudicated previously."

The mere fact that a proceeding based upon Section 6 notices in April, 1960, has gone through the various prescribed steps should not entitle the flight engineers to receive one "strike coupon" good in perpetuity which may be dusted off and redeemed at will in future years by a strike regardless of the then situation and the specific controversies then dividing the parties. And upon the facts as disclosed by the record, I am left with no doubt that the controversial issues of June, 1962, primarily "crew comple-

ment" and "representation," as to which the NMB proffered its services had not theretofore been subjected to the required procedures of the RLA. Whether the dispute be denominated "major" as the majority hold, and with which view I am inclined to agree, or "minor" as the court below indicated, the real question is: have the parties with respect to the current fundamental issues exerted "every reasonable effort to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption in commerce or to the operation of the carrier growing out of any dispute between the carrier and any employee thereof" (Sec. 2, First, RLA). If they have not, the courts have not been reluctant to enjoin strike action until the parties have complied with RLA requirements. Were the provisions of the Norris-LaGuardia Act, which so concern the majority, mandatory against the issuance of any strike injunction, all previously issued injunctions in RLA cases should be invalid. That this result has not come to pass seems to stem from the doctrine of "accommodation" of one Act to the other which permits them to exist side by side.

I have no quarrel with the majority view of the law that in a "major" issue "no injunction can issue under the Act against a strike which is undertaken after the mediation processes of the Act have been completed." However, in my opinion, this generality serves little purpose unless the questions be asked and answered: "mediation processes" directed to what issues; and have these processes been "completed" as to such issues? The majority concede that the "crew complement" issue was not included within the scope of the Section 6 notices and was not considered by either the NMB or the Presidential Emergency Board. Yet it was this issue and the related representation issue which were the primary causes of the June, 1962, strike.

This is not a case of one of the parties trying to relitigate old issues and thereby obtain a second "go around" before

the NMB and a second "cooling-off" period. And to say that once a dispute has been processed by the NMB, no issues no matter how new and different can be made the subject of mediation within the provisions of the RLA, is to read language into the Act which is not there. Such an interpretation would mean that every proceeding must end in a strike before a new one can be commenced. This approach is scarcely consistent with the Supreme Court's comment in Texas & N. O. R. R. v. Brotherhood of Ry. Clerks, 281 U.S. 548, 565, 50 S.Ct. 427, 74 L.Ed. 1034 (1930) that "the major purpose of Congress in passing the Railway Labor Act was 'to provide machinery to prevent strikes.'" And certain it is that the NMB ought to have an opportunity under the Act to mediate a first time as to the critical strike issues.

I find nothing in the law to support the majority's statement that a party after RLA procedures have been exhausted as to certain issues cannot "set them in motion for a second time by the service of a Section 6 notice raising new issues." The three cases cited provide no support. In Pittsburgh & Lake Erie R. R. v. Brotherhood of R. R. Trainmen, W.D.Pa.1959, 179 F.Supp. 271, the court specifically said (p. 277), "It is undisputed that this dispute [attempted to be added] is the same dispute previously mediated unsuccessfully by the Board." In Northwest Airlines, Inc. v. Airline Pilots Association, D.Minn.1960, 185 F. Supp. 77, the court found that (p. 80), "No new issues of a different nature appear to be posed by the filing of the later Section 6 openers." In American Airlines, Inc. v. Air Line Pilots Ass'n, S.D. N.Y.1958, 169 F.Supp. 777, there was no question of the injection of new issues because the case related to June, 1957, notices. There, the court referring to a subsequent notice said (p. 797), "It may be, as the Company claims, that there was some obligation on the part of the Union to bargain with respect to the Company's November 1, 1958 'opener'." All that was covered by the decision was that the new notice did not prevent "a

strike with respect to the subject matter of the dispute which had been fully processed under the Railway Labor Act, in which the Emergency Board had acted, and concerning which the cooling-off period had expired." In other words, the strike was related to the original issues which is not the situation here. The same conclusion is found in Continental Air Lines, Inc. v. Flight Engineers Int'l Ass'n, 40 CCH Labor Cases ¶ 66,645, S.D.Calif.1960 because "the strike issues were and are solely referrible to the plaintiff's proposed operational changes which were fully mediated to a conclusion by the Board in its Case No. A–6151."

A case far more analogous and to me more persuasive is Pullman Co. v. Order of Railway Conductors and Brakemen, 44 CCH Labor Cases ¶ 17,577, N.D.Ill., decided on April 23, 1962. There the court granted an injunction, saying:

"4. The issues now in dispute between the parties are substantially different from those submitted and voted on by the members of the Conductors' organization in September, 1959.

*    *    *    *    *    *

"6. The proposals first presented by defendants in December, 1961, raised new issues beyond the scope of any notice previously served by defendants pursuant to Section 6 of the Railway Labor Act. As to the issues now in dispute between the parties the processes of the Railway Labor Act have not been exhausted. The strike called by defendants is, therefore, illegal and should be enjoined.

"7. Since the defendants have violated the Railway Labor Act the provisions of the Norris-LaGuardia Act are inapplicable. An injunction should issue enjoining defendants from striking over the proposals in dispute until the procedures of the Railway Labor Act have been exhausted, *    *    *"

A similar result upon a proper factual showing was at least suggested by the court in Pittsburgh & Lake Erie R. R. (supra, 179 F.Supp. pp. 277–278), as follows:

"[4] It is conceivable that an 'old' dispute involving the same set of facts could become a 'new' dispute if one or both of the parties slept on their rights (in this instance the right to strike) for a considerable period of time. Laches could bar the plea of previous mediation. To allow the interpretation of a vital public service within fact no warning could cause great harm to those dependent on the service. But to hold that the strike must be called on the exact expiration date of the provisions of the Act would also be against public policy. Continuation of negotiations for a reasonable period should be encouraged. Here we find no unreasonable delay on the part of the Union so as to make this dispute subject to a new enforcement of the procedures to [sic] the Act."

I conclude, therefore, on the facts and the law that the temporary restraining order is appealable as if it were a preliminary injunction (Sims v. Greene, 3 Cir., 1947, 160 F.2d 512); that the proceedings before the NMB and the Emergency Board arose out of the Section 6 notices of April and May, 1960, and the subject matter set forth therein; that the events and disputes arising therefrom which led up to the controversy causing the strike threat in June, 1962, were not known, could not have been known and were not embraced in the proceedings before the NMB and the Emergency Board; that the A&P, the furloughees, the "crew complement" and the "representation" issues have never been presented for processing under Section 10 of the RLA to the NMB or the Emergency Board; that in June, 1962, the NMB offered its mediation services as provided in the Act and could have heard such issues had the flight engineers not gone out on strike; and that.

855

the failure of the flight engineers to comply with the requirements of the Act is a violation thereof, entitling Pan American to a preliminary injunction.

Accordingly, I would affirm the order.